UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL FLUKER,

       Plaintiff,

    v.

NANCY A. BERRYHILL,[1]

       Defendant.

Case No. 16-cv-01472-JCS

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, AND REMANDING FOR AWARD OF BENEFITS**

Re: Dkt. Nos. 23, 26

## I.    INTRODUCTION

Plaintiff Michael Fluker seeks review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), denying his application for disability benefits under Title II and Title XVI of the Social Security Act. Presently before the court are the parties' cross-motions for summary judgment.[2] Fluker asks the Court to reverse the Commissioner's denial of benefits and remand for an award of benefits or, in the alternative, to remand for further proceedings. The Commissioner asks the Court to affirm its decision denying benefits to Fluker. The Commissioner further requests that the Court remand for further proceedings rather than awarding benefits if it finds that the denial of benefits was in error.

For the reasons stated below, the Court GRANTS Fluker's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case for award of benefits.

---

[1] Nancy Berryhill became the Acting Commissioner of Social Security on January 23, 2017, and is therefore substituted for Carolyn W. Colvin as the Defendant in this action. See 42 U.S.C. § 405(g); Fed. R. Civ. P. 25(d). This Order refers to Berryhill as the "Commissioner."
[2] All parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).

## II.    BACKGROUND

### A.    Procedural History

On August 6, 2012, Fluker submitted an application for disability insurance benefits under Title II of the Social Security Act, alleging he was unable to work due to "depression, [Posttraumatic Stress Disorder (PTSD)], and mild mental retardation" as of December 31, 2001. Administrative Record ("AR") at 213–33.  The Social Security Administration ("SSA") denied Fluker's claim on March 15, 2013, and affirmed the denial on reconsideration on July 29, 2013.  *Id.* at 136, 145.  Fluker filed a written request for a hearing regarding the denial of disability benefits on August 21, 2013.  *Id.* at 151.  ALJ Richard P. Laverdure held a hearing on July 9, 2014 and issued a decision on November 10, 2014 finding Fluker not disabled.  *Id.* at 13–22.  The SSA Appeals Council considered and denied Fluker's request for review on February 9, 2016, finding "no reason under [its] rules to review the ALJ's decision."  *Id.* at 1.

Fluker filed the present action challenging that denial on March 24, 2016 pursuant to 42 U.S.C. § 405(g), which gives the Court jurisdiction to review the Commissioner's final decision. Fluker filed the instant Motion for Summary Judgment on November 14, 2016.  Pl. Mot. (dkt. 23). The Commissioner filed a Motion for Summary Judgment on June 10, 2017.  Comm'r's. Mot. (dkt. 26).  Fluker filed his Reply on February 17, 2017.  Reply (dkt. 29).

### B.    Prior Denial of Disability

On August 17, 2010, Fluker applied for disability benefits and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act, with an alleged onset date of December 31, 2001.  AR at 83.  The SSA denied both claims on December 5, 2010, and affirmed the denial on reconsideration on April 1, 2011.  *Id.*  Fluker filed a written request for a hearing regarding these denials on June 8, 2011.  *Id.*   ALJ Mary P. Parnow held a hearing on March 22, 2012, and issued a decision on June 12, 2012 finding Fluker not disabled.  *Id.* at 83–92.

In her written decision, the ALJ identified Fluker's "status post left foot fracture; depression; PTSD; and polysubstance abuse" as severe, and found that his mental impairments met the criteria for disability under the criteria listed in 12.04 and 12.09 of 20 CFR Part 404, Subpart P, Appendix 1 ("the Listings").   AR at 86.  She further found, however, that if Fluker

were to stop abusing substances, his impairments would not meet or medically equal any

impairments listed in the Social Security regulations. *Id.* at 86–87. She went on to find that if

Fluker stopped the substance use, he would have the residual functional capacity to perform the

limited range of medium work. AR at 87. In addition, she found that he could:

> lift/carry up to 50 pounds occasionally and 25 pounds frequently;
> and sit for up to 6 hours, and stand or walk for approximately 2
> hours, in an 8 hour workday. He can never climb
> rope/ladder/scaffolds and can occasionally climb stairs/ramps. He
> can occasionally balance, stoop, kneel, crouch and crawl, and his
> left foot control operation is limited to occasional. With respect to
> his mental restrictions, he is limited to simple routine tasks, with
> limited public contact and no responsibility for the safety of others,
> and is able to maintain concentration, persistence and pace for 2-
> hour increments.

*Id.* In reaching her conclusion, she afforded "little weight" to the opinion of Sherry Lebeck,

Ph.D. in an evaluation dated October 14, 2010 in which Dr. Lebeck opined that Fluker was unable

to sustain consistent work activity due to his marked mental limitations and that Fluker "drinks to

self-medicate." *Id.* at 88. The ALJ reasoned that Dr. Lebeck's opinion was conclusory and that

because she had performed only a one-time evaluation, she had no longitudinal history upon

which to base her opinion. *Id.* at 88-89. The ALJ also noted that that it "appears the claimant was

intoxicated at the time of his examination." *Id.* at 89.

To "determine the extent of erosion of the unskilled medium occupational base caused by

the limitations that would remain," the ALJ heard testimony from a vocational expert regarding

whether jobs exist in the national economy for an individual with the claimant's age, education,

work experience, and the residual functional capacity [Fluker] would have if he stopped the

substance use." *Id.* at 91. Based on the vocational expert's testimony, the ALJ found that absent

substance use Fluker would be capable of working as an assembler, nut sorter, or order clerk and

therefore, that he was not disabled. *Id.* Fluker did not appeal that decision.

### C. Fluker's Personal History

Fluker alleges that he suffers from depression and PTSD stemming from witnessing his

older brother James being shot and killed on November 11, 2001. *Id.* at 533. In 2010, Fluker was

the victim of a shooting attempt, but was not hit. *Id.* at 358. In one account, Fluker was shot at

while "wandering the streets looking for shelter," *id.*; in another, the shooting occurred when a gunman in an adjacent car shot at Fluker while he was driving with friends, *id.* at 549.

Fluker was born in Berkeley, California on August 6, 1980. He is the youngest of four children. AR 215, 492. At the time of his most recent psychological evaluation, on May 1, 2014, he was living with his parents and two sons, ages five and fourteen. *Id.* at 537. Fluker was homeless between 2005 and 2013. *Id.* at 549. He also reports having a daughter he has not seen "in some years." *Id.* at 537.

Fluker was enrolled in an art school from the seventh through the twelfth grade. *Id.* at 548. Beginning in junior high school, Fluker participated in special education classes in English and math. *Id.* He usually received Cs and Ds in his academic classes and, according to Fluker, was nearly required to repeat the twelfth grade. *Id.* Fluker states that he graduated from high school in 1998. *Id.*

Fluker has been unemployed for the majority of his adult life. *Id.* at 548. In the 15 years preceding Fluker's alleged disability, he has worked six jobs, all between 1998 and 2000. *Id.* at 282–89. He has worked as a UPS truck loader, a security guard for American Protective Services, a grocery store bagger, and a pizza delivery person. *Id.* His only full-time jobs were as a security guard for American Protective Services and as a grocery store bagger. *See id.* at 71. His total reported earnings between 1998 and 2000 amount to $9,422.40. *Id.* at 234. Currently, his sole source of income is $336 per month in General Assistance. *Id.* at 538.

Fluker reports that he has "about four convictions," for which he has been incarcerated "for a total of five to six years." *Id.* at 538. He was first arrested at age nineteen for domestic violence. *Id.* at 442. He has also been arrested for driving under the influence. *Id.* at 538. His most recent arrest was on August 28, 2012, for receiving stolen property and violating probation for possession of heroin, which led to a 90-day sentence in Santa Rita county jail. *Id.* at 405, 538. While at Santa Rita, Fluker worked in the kitchen for about six hours per day, four days a week. *Id.* at 55–56. Fluker reported that Santa Rita would have given him "extra time" had he not worked, and stated that he did "[p]oorly" at his job. *Id.* at 55.

Fluker has abused alcohol since age 18, using it on a social basis until his brother died on

November 11, 2001. *Id.* at 533, 549. After his brother's death, Fluker began consuming alcohol "every day, all day" until he was incarcerated for domestic violence. *Id.* Fluker did not consume alcohol while incarcerated. *Id.* After his release in November 2012, Fluker continued to drink alcohol daily, but "cut back" on his consumption. *Id.* Fluker has been using marijuana on a daily basis since high school. *Id.* In 2000, Fluker began using ecstasy; after his brother died in 2001, he used ecstasy "almost daily" for one to two years, and last used it in 2011. *Id.* Fluker has also used cocaine and methamphetamine; Fluker has denied using heroin, though he was arrested for possession of heroin in 2012. *Id.*

### D. Relevant Medical History

#### 1. Dr. Sherry L. Lebeck

Fluker was referred to evaluating physician Dr. Sherry L. Lebeck, Psy.D., by Stephen Statler, Fluker's Mental Health Advocate, for an evaluation to determine Fluker's eligibility for SSI benefits, in connection with his prior application for benefits. AR at 491–98. Dr. Lebeck evaluated Fluker once on October 14, 2010. *Id.* at 491. Dr. Lebeck conducted a clinical interview, reviewed Fluker's prior records, and evaluated Fluker with the following tests: (1) projective drawings; (2) the Wechsler Abbreviated Scale of Intelligence ("WASI"); (3) the Wide Range Achievement Test - 4 ("WRAT-4"); (4) the Beck Depression Inventory-II ("BDI-II"); and (5) a Mental Status Examination ("MMSE"). *Id.*

Dr. Lebeck first observed Fluker outside the building 15 minutes before his appointment. *Id.* Fluker "appeared confused and lost," and was "unsure where he was supposed to go and had difficulty stating why he was at the building." *Id.* Fluker's appearance "was disheveled; Dr. Lebeck reported that he wore pajama bottoms and a white t-shirt, both of which were inside out. *Id.* Dr. Lebeck stated that Fluker "smelled of alcohol" and that, when asked about drinking, Fluker admitted to having had "a beer in the morning." *Id.* Dr. Lebeck noted that testing was at 4:00 pm. *Id.* Dr. Lebeck reported that Fluker was cooperative throughout the clinical interview, but displayed poor eye contact and frequently appeared to have difficulty following Dr. Lebeck's line of questioning, which "was especially true during the mental status section of the test." *Id.* at 491–92. Fluker's speech was "slowed and soft," and he had difficulty with attention and memory.

*Id.* at 492. By way of example, Dr. Lebeck notes that Fluker placed the current year as 2009 (when it was 2010), the month as November (when it was October), and the state as Oakland. *Id.* Dr. Lebeck found that Fluker, "though oriented to person and place, appeared preoccupied through most of the interview," and that his mood was "dysphoric with flat affect." *Id.*

Dr. Lebeck noted that Fluker described symptoms consistent with a PTSD diagnosis, including flashbacks, hyper vigilance, sleep disturbance, nightmares, fearfulness, and crying. *Id.* at 497. Dr. Lebeck also reported symptoms of depression with associated psychotic symptoms including anhedonia, flat affect, anxiety, auditory and visual hallucinations, and confusion. *Id.* Dr. Lebeck also stated that, while Fluker had been prescribed medication for these symptoms, he was not taking them because they "were apparently confiscated by police when he was a passenger in [a] car containing stolen goods." *Id.* He had not returned to his psychiatrist to have his medication refilled because, according to Fluker, "the one clinic he can return to is difficult for him to reach by public transportation." *Id.* Fluker also told "a confusing story about other doctors telling him that he cannot have medication," leading Dr. Lebeck to believe that, in lieu of taking medication, Fluker used alcohol to self-medicate. *Id.*

Dr. Lebeck administered the WRAT-4 test, which placed Fluker at the First grade level in word reading and arithmetic, at the kindergarten level in spelling, and at the Third grade level in sentence comprehension; Dr. Lebeck opined that the latter score was higher "likely due to the fact that [she] helped the client with the reading portion of the test after the first four sentences, since he had difficulty reading the words." *Id.* at 495. Dr. Lebeck also administered the WASI test, the results of which reflected that Fluker had a Full Scale IQ ("FSIQ") at the Extremely Low range. *Id.* at 495–96. When asked to draw, Dr. Lebeck reported that Fluker's drawings were "primitive in nature, and devoid of details." *Id.* at 496.

Based on these tests and Fluker's descriptions of his symptoms, Dr. Lebeck reported a Global Assessment of Functioning ("GAF") score of 38–40 and diagnosed Fluker with PTSD, severe Major Depressive Disorder ("MDD") with psychosis, alcohol abuse, and mild mental retardation. *Id.* Dr. Lebeck opined that Fluker met "the criteria of an individual with a severe mental condition, having exhibited symptoms for at least 10 years." *Id.* at 498. Dr. Lebeck found

that Fluker's diagnosis was "likely a permanent condition (more than 12 months)." *Id.* at 497.

"As such," Dr. Lebeck concluded, "Fluker should be eligible for SSI benefits." *Id.* at 498.

In a subsequent clarification of her earlier report that appears to have been submitted to the SSA in January 2012, after Fluker's prior disability claim was denied initially but before the hearing before the ALJ in March 2012, Dr. Lebeck pointed out that, while she had previously reported that Fluker "smelled of alcohol" at his evaluation, he had been 15 minutes early for the appointment, which "had he been drinking he would not have been able to accomplish." *Id.* at 499. "In addition, during the testing process, Mr. Fluker did not slur his words nor did his behavior indicate intoxication." *Id.* Dr. Lebeck stated that Fluker's condition and responses "were not those of an individual who was inebriated, but rather of a person who is cognitively challenged." *Id.* Dr. Lebeck further stated that Fluker's behavior during the interview was consistent with an individual with cognitive functioning in the Extremely Low Range and who suffered from extreme symptoms of PTSD, as well as psychotic depression. *Id.* at 499–500. Dr. Lebeck also pointed out that Fluker's symptoms of confusion were "the same type of confusion noted outside of the building prior to Mr. Fluker's appointment for testing." *Id.* at 500. Dr. Lebeck then opined that, while Fluker had used alcohol in the past to self-medicate, he would not be dependent on alcohol if he had assistance in obtaining the resources needed to reduce his symptoms. *Id.* In Dr. Lebeck's opinion, Fluker was "not cognitively capable of finding the appropriate resources to benefit himself, nor [was] he capable of working." *Id.* According to Dr. Lebeck, Fluker had "severe psychiatric and cognitive conditions" that he had experienced for over ten years which rendered him "incapable of following even simple directions at the workplace." *Id.* Dr. Lebeck concluded by "respectfully request[ing] that the evaluators in this case reevaluate their position and grant Mr. Fluker SSI benefits." *Id.*

### 2. Dr. Puran Khalsa

Fluker was referred to evaluating physician Dr. Puran Khalsa, Psy.D. by attorney Nancy McGee, for a psychological report to evaluate his cognitive and emotional functioning. AR at 353–60. The evaluation took place on January 26, 2012. *Id.* at 353. Dr. Khalsa conducted a clinical interview, filled out a Mental Status/Psychiatric Symptoms Sheet, and assessed Fluker via

the following tests: (1) the Test of Memory Malingering ("TOMM"); (2) the Repeatable Battery for the Assessment of Neuropsychological Status-Form A ("RBANS-A"); (3) Trail Making tests A & B; (4) a Clock Drawing Task; (5) an MMSE; (6) the Barona Estimate of IQ; (7) the BDI-II; and (8) the Beck Anxiety Inventory ("BAI"). *Id.* at 355–57.

Dr. Khalsa reported that Fluker looked "scattered upon arrival," and that Fluker was escorted by his cousin, who "directed him to follow the examiner toward the exam room in a stern manner as if he were a child." *Id.* at 354. Dr. Khalsa reported that "[Fluker's] clothes were dirty and his fingernails were long and filthy showing obvious hygiene issues." *Id.* According to Dr. Khalsa, Fluker showed "restricted and flat affect with a blank look on his face" during the evaluation, and his speech was "slowed, soft, and slurred." *Id.* Dr. Khalsa stated that Fluker's thought flow was "riddled with loose associations based on illogical beliefs." *Id.* Fluker reported an "ongoing relationship with his dead brother[']s spirit on a daily basis." *Id.* Dr. Khalsa found that "[Fluker's] use of language was significantly limited and he continuously lacked the capacity to interpret complex social cues, requiring the direction and nature of the conversation to be entirely concrete." *Id.* Dr. Khalsa noted that Fluker's past treatment records indicated "different levels of substance abuse," and included usage of alcohol, cocaine, and amphetamines. *Id.*

Dr. Khalsa assessed Fluker with an RBANS-A test, which "indicated serious problems with his immediate memory and attention." *Id.* Dr. Khalsa also noted that the RBANS-A test placed Fluker in the extremely low range of the Language Index, indicating "severe limitations in this domain." *Id.* at 356. Dr. Khalsa noted that his scores increased over the given trials showing "the normal progression of retention," and that his TOMM results indicated that he was not "attempting to exaggerate his symptoms for any secondary gain." *Id.* at 355. Based on "previous testing results and [Fluker's] educational and occupational attainment," Dr. Khalsa estimated Fluker's IQ to be in the "extremely low range." *Id.* A Mini Mental State Examination scored Fluker at 14/30; Dr. Khalsa stated that scores below 20 "often indicate the presence of cognitive disorder." *Id.* According to Dr. Khalsa, Fluker's BAI results indicated that Fluker experienced a "moderate level of anxiety." *Id.* at 357. Dr. Khalsa reported that Fluker suffered from severe impairments in memory, language, attention/concentration, and visual/spatial abilities, as well as

marked impairments in executive functioning. *Id.* at 356–57.

On the Mental Status/Psychiatric Symptoms Sheet, Dr. Khalsa checked boxes indicating extreme impairments in Fluker's ability to: (1) maintain attention and concentration for two hour segments; (2) perform at a consistent pace without an unreasonable number and length of rest periods; (3) get along and work with others; (4) interact appropriately with the general public; (5) accept instructions and respond appropriately to criticism from supervisors; (6) respond appropriately to changes in a routine work setting and deal with normal work stressors; (7) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (8) maintain regular attendance and be punctual within customary, usually strict tolerances. *Id.* at 360. On the same sheet, Dr. Khalsa also indicated marked impairments in Fluker's ability to: (1) understand, remember, and carry out very short and simple instructions; and (2) understand, remember, and carry out detailed instructions. *Id.*

Based on the clinical interview and Fluker's test results, Dr. Khalsa reported a GAF score of 35 and diagnosed Fluker with severe MDD with psychotic features, chronic PTSD, generalized anxiety disorder, schizophrenia, and mild mental retardation. *Id.* at 357. Dr. Khalsa concluded that because of "the combination of emotional deregulation with psychotic features, and sleep disturbance related to his chronic PTSD, Mr. Fluker is completely inappropriate for any type of job setting at this point." *Id.* at 358. Dr. Khalsa further concluded that Fluker's condition would not repair itself and that "he will likely continue to have active posttraumatic symptoms for the rest of his life." *Id.*

### 3. LifeLong Medical Care

Fluker sought treatment at the LifeLong Medical Care Downtown Oakland Clinic on four occasions between May 25, 2012 and June 20, 2012. AR at 381–84. Fluker's first visit was with Dr. Lester Love, M.D. on May 25, 2012, and lasted fifteen minutes. *Id.* at 381. According to Dr. Love, Fluker stated that a prior unnamed medical officer recommended Fluker see a psychiatrist. *Id.* Dr. Love observed that Fluker had a flat affect, that Fluker had low energy, and that Fluker had "some confusion" but was cooperative. *Id.*

On May 31, 2012, Fluker met with Nurse Practitioner Joshua Sanderman regarding a

9

physical ailment with which this action is not concerned. *Id.* at 382.

Dr. Love met with Fluker again on June 8, 2012. *Id.* at 383. There, Fluker discussed his grief stemming from witnessing his brother being shot and killed in 2001. *Id.* Fluker also reported that a prior unnamed medical officer was worried for Fluker, on the basis of Fluker's: (1) mood fluctuations; (2) constant crying; (3) not trusting others; and (4) isolation. *Id.* Fluker also reported visual hallucinations (seeing shadows) and auditory hallucinations (hearing whispers). *Id.* Dr. Love's objective findings included: (1) poor eye contact; (2) dysphoria; (3) soft speech; (4) auditory and visual hallucinations; and (5) no suicidal or homicidal ideation. *Id.* Dr. Love's assessment included a diagnosis of recurring MDD, and a "rule-out" diagnosis of PTSD. Dr. Love's recommended that Fluker undergo counseling. *Id.*

Fluker then met with Licensed Social Worker Shari Gleicher on June 20, 2012 for counseling. *Id.* at 384. Ms. Gleicher's objective findings were that Fluker was dysphoric, soft spoken, and exhibited low energy. *Id.* Ms. Gleicher also noted auditory and visual hallucinations in her objective findings. *Id.* Ms. Gleicher listed Fluker's impairments, including: (1) a "rule-out" diagnosis of PTSD; and (2) recurring MDD. *Id.* Gleicher also noted that Fluker's attorney had recommended Fluker undergo drug treatment to establish a period of sobriety. *Id.*

### 4. Alameda County Behavioral Health Care Services

While incarcerated at Santa Rita Jail, Fluker met with Alameda County Behavioral Health Care Services on six separate occasions, between September 6, 2012 and November 21, 2012. AR at 405–19. Fluker was first referred to Licensed Marriage and Family Therapist ("LMFT") Leonicia Castro on September 6, 2012, *id.* at 405–06, because Fluker could not obtain a refill of his Zoloft prescription, *id.* at 405. LMFT Castro assessed Fluker, finding that he had a depressed mood and sad affect, though she found that his behavior, orientation, thought content, memory, and thought process were within normal limits. *Id.* at 406. Fluker's insight, impulse control, and judgment were all noted as "Good." *Id.* Fluker did not report any hallucinations during the September 6 assessment. *See id.* at 405–06. LMFT Castro listed Fluker's diagnoses as PTSD and MDD, and Fluker's GAF score as 45. *Id.* at 406.

Fluker then met with physician Dr. Fred Rosenthal, first on September 19, 2012. *Id.* at

407. According to Dr. Rosenthal, Fluker reported feeling depressed. *Id.* Fluker also reported a history of heavy alcohol use in the past, though he stated that he had "reduced his use recently." *Id.* Dr. Rosenthal found that Fluker appeared to be in a sad mood, "seemed to lack energy," and spoke slowly. *Id.* According to Dr. Rosenthal, Fluker "remain[ed] cooperative and [was] able to communicate in a reasonable manner." *Id.* Dr. Rosenthal's assessment was that Fluker "seemed moderately depressed." *Id.* Dr. Rosenthal prescribed Fluker Zoloft and Trazadone. *Id.* The report from that meeting shows that Fluker's Episode Diagnosis Information included a diagnosis of PTSD and a GAF score of 45, though the report is silent as to how those determinations were made. *Id.* The same diagnosis information appears on every subsequent report as well. *Id.* at 407–13.

Fluker failed to appear for his October 8, 2012 appointment with LMFT Castro. *Id.* at 408. His next follow-up appointment with LMFT Castro was on October 19, 2012. *Id.* at 409. Fluker reported increasing symptoms of anxiety, including an increased heart rate and sweaty hands. *Id.* According to LMFT Castro, Fluker also reported "hearing voices—no commands—background noise essentially." *Id.* LMFT Castro then referred Fluker to see Dr. Rosenthal again for a re-evaluation of his current medication regimen. *Id.*

Fluker met with Dr. Rosenthal for the second time on October 19, 2012, after his appointment with LMFT Castro. *Id.* at 410. According to Dr. Rosenthal, Fluker requested to add Risperdone to his medication regimen, as well as increasing his dosage of Zoloft. *Id.* Medication order forms show that Dr. Rosenthal prescribed Fluker with 2mg daily of Risperidone, *id.* at 416, increased Fluker's Zoloft dosage to 100mg, *id.* at 415, and increased Fluker's Trazodone dosage to 150 mg, *id.* at 417.

Fluker then met LMFT Castro for a follow-up appointment on November 2, 2012. *Id.* at 411. According to LMFT Castro, Fluker reported feeling less depressed since Dr. Rosenthal adjusted his medication on October 19, 2012. *Id.* Fluker reported spending his time in jail sleeping and reading. *Id.* LMFT Castro found that Fluker still presented as flat, with a depressed mood. *Id.* LMFT Castro also stated that Fluker admitted to "hearing voices—slightly—with no commands." *Id.* Fluker denied experiencing visual hallucinations. *Id.*

Fluker's third and final meeting with Dr. Rosenthal was on November 21, 2012, for the purpose of planning his treatment after discharge. *Id.* at 412. Dr. Rosenthal found that Fluker "fe[lt] in control," and that Fluker's mood was "fair but su[b]dued." *Id.* According to Dr. Rosenthal, Fluker denied any urgent problems and stated that he took his medication regularly. *Id.* Dr. Rosenthal's assessment was that Fluker seemed "to be respondin[g] satisfactorily" to his prescriptions, and that Fluker had agreed to continue treatment. *Id.* Fluker's prescriptions were set to continue through December 14, 2012. *Id.* Fluker was no longer in custody of Santa Rita Jail as of November 24, 2012. *Id.* at 413.

While in Santa Rita Jail, Fluker was screened for a food handler position. *Id.* at 420, 430–32. According to Registered Nurse ("RN") Zenaida Gutman, Fluker denied having any medical condition that would restrict him from working. *Id.* A urinalysis dipstick returned "negative results." *Id.* at 431. RN Gutman filled out the Food Handler Health Screening form, checking as negative every box in the three categories on the form: "Physical Status," "General Health" and "Disease Checklist." AR at 430. The form did not address mental health conditions or symptoms. *Id.*

### 5. TRUST Clinic (Dr. Michael Boroff)

Fluker sought treatment at the Alameda County Healthcare for the Homeless Trust Clinic on eight occasions between August 7, 2012 and June 25, 2013. AR at 442–76. Fluker met with Mid-level Practitioner Laurel Barber once, on August 7, 2012. *Id.* at 442. Fluker reported symptoms of severe depression, anxiety, grief, PTSD, and auditory hallucinations, all stemming from witnessing the murder of his brother. *Id.* Fluker also reported using cannabis two to three times a day, and that he had a medical marijuana card; Ms. Barber noted her suspicion that Fluker was under-reporting his cannabis use, based on a strong smell of cannabis "emanating from his clothing" and Fluker's slurred speech and difficulty staying alert during the interview. *Id.* at 449. Ms. Barber reported that Fluker complained of poor concentration, poor sleep, nightmares, anhedonia, depressed mood, and anergia[3]. *Id.* Fluker reported hearing his brother's voice

---

[3] Lack of mental energy, debility; passivity. *Anergia*, <u>Oxford English Dictionary</u> (7th ed. 2013)

whispering to him. *Id.* Additionally, Fluker reported seeing "shadows," which he stated began "while he was incarcerated."[4] *Id.* Ms. Barber diagnosed Fluker with depressive disorder, recommended he be prescribed antidepressants, and referred Fluker to Dr. Michael Boroff, Psy.D., for psychotherapy. *Id.* at 450.

Dr. Boroff met with Fluker seven times, over a period between November 29, 2012 and June 25, 2013. *Id.* at 451–56, 468–76. According to Dr. Boroff, Fluker reported hearing his deceased brother's voice, as well as "whispers that he cannot hear clearly." *Id.* Dr. Boroff writes that "these happen regularly, though not daily, and began roughly 7 years ago." *Id.* Dr. Boroff stated that Fluker reported "symptoms of PTSD, including regular nightmares, avoidance (doesn't talk or think about traumas, numbing), and hypervigilance." *Id.* Dr. Boroff also reported Fluker having memory issues, and that Fluker felt "lost in life." *Id.* Dr. Boroff's primary diagnosis was prolonged PTSD; Dr. Boroff also diagnosed Fluker with "[MDD], recurrent, moderate" and "panic disorder without agoraphobia." *Id.* at 452.

During Fluker's second meeting with Dr. Boroff on December 13, 2012, Dr. Boroff stated that Fluker "reported being illiterate, though he graduated from high school without merit." *Id.* at 453. Fluker also reported "a history of marijuana, alcohol, and ecstasy, though he denied current use." *Id.* According to Dr. Boroff, "[Fluker's] affect was not always mood congruent, as he got a smile/smirk on his face at times during difficult topics." *Id.* Dr. Boroff also noted "a manipulative quality to [Fluker's] interactions in this session, as if he needed to play a game in order to get what he wants (help/SSI)"; Dr. Boroff then opined that this behavior "also spoke to poor cognitive functioning, which has been noted in his records." *Id.* Dr. Boroff, in addition to his diagnoses from the first session, diagnosed Fluker with Mild Mental Retardation. *Id.* at 454.

During Fluker's third meeting with Dr. Boroff on January 15, 2013, Fluker reported "continued problems with depression, anxiety, and insomnia." *Id.* at 455. According to Dr. Boroff, Fluker "struggled to articulate himself, often speaking in vague terms, rambling, and talking in a non-linear fashion." *Id.* Fluker's substance use history was discussed "at length"; Dr.

---

[4] The Court notes that Ms Barber's report is unclear as to which period of incarceration Fluker is referring to here.

Boroff stated that Fluker "talked about his efforts to self-medicate using ecstasy, cocaine, and alcohol." *Id.* According to Dr. Boroff, Fluker had "been clean for some time and [was] frequently tested because of his probation status." *Id.*

Dr. Boroff, based on the above evaluations, completed a Psychological Evaluation of Fluker, which included a Mental Status Examination and WASI test, as well as a Mental Impairment Questionnaire. *Id.* at 442–48. The Psychological Evaluation is not dated, while the Mental Impairment Questionnaire is dated January 16, 2013. *Id.* at 442–43, 448. According to Dr. Boroff, Fluker acknowledged "significant difficulties in reading and understanding things that are said to him." *Id.* at 442. In Dr. Boroff's discussion of Fluker's relevant history, Dr. Boroff stated that "[Fluker] cannot read or write." *Id.* Dr. Boroff's Mental Status Examination found that "[a]t times, [Fluker] [did] not seem to comprehend things that [were] explained to him," and that Fluker was "illiterate, requiring verbal explanations of anything he is required to sign." *Id.* at 443. Dr. Boroff stated that Fluker appeared "to be of below average intelligence and has a difficult time remembering things and often loses focus." *Id.* Dr. Boroff noted that, in the past, Fluker had self-medicated with ecstasy, cocaine, and alcohol, and that records also indicated prior amphetamine use. *Id.* at 442–43. Dr. Boroff then stated that "[Fluker] is currently clean and is regularly drug tested as part of his probation." *Id.* at 443.

Dr. Boroff diagnosed Fluker with: (1) "[MDD], Recurrent, Moderate"; (2) "[PTSD], Chronic"; (3) "Panic Disorder without agoraphobia"; and (4) "Mild Mental Retardation." *Id.* at 443. Dr. Boroff assigned Fluker a GAF score of 35, *id.*, and conducted a WASI test, which scored Fluker's FSIQ at 67, *id.* at 447. On the Mental Impairment Questionnaire, Dr. Boroff recorded that Fluker had no useful ability to function in the following categories: (1) maintaining attention for a two-hour segment; (2) maintaining regular attendance and being punctual within customary tolerances; (3) sustaining an ordinary routine without special supervision; (4) working in coordination with or proximity to others without being unduly distracted; (5) completing a normal workday and workweek without interruptions from psychologically based symptoms; (6) accepting instructions and responding appropriately to criticism from supervisors; and (7) dealing with normal work stress. *Id.* at 446. Dr. Boroff also found that Fluker's symptoms gave rise to

14

marked restrictions in: (1) activities of daily living; (2) maintaining social functioning; (3)

maintaining concentration, persistence, or pace, as well as one or two repeated episodes of

decompensation within a twelve month period. *Id.* at 447. Dr. Boroff recorded that Fluker was

not a malingerer. *Id.* at 448.

Dr. Boroff concluded that Fluker had been suffering from "severe mental illness for at least

seven years, triggered by the witnessing of his brother's murder." *Id.* at 443. Dr. Boroff further

concluded that Fluker's prior drug use was "a clear attempt to self-medicate, and presently, in the

absence of drugs, Mr. Fluker's mental health issues remain." *Id.* Dr. Boroff's prognosis was that

Fluker was disabled, and expected Fluker to remain so for at least twenty-four months. *Id.* at 443–

44.

Fluker's continued to meet with Dr. Boroff after the assessments which formed the basis of

Dr. Boroff's Psychological Evaluation. *Id.* at 469–76. During Fluker's fourth meeting with Dr.

Boroff on January 29, 2013, Fluker reported that the Effexor had still provided no benefit. *Id.* at

469. Fluker also reported staying with his mother again, though he continued "to struggle with the

pictures of his brother present in his home." *Id.* According to Dr. Boroff, Fluker "continued to

feel that working is not possible for him at this time." *Id.* Dr. Boroff found that Fluker's mental

status "continue[d] to be striking due to his flat affect, clearly depressed state, and low cognitive

functioning." *Id.*

On April 2, 2013, Fluker was seen together by Dr. Boroff and Primary Care Physician

Damon Francis, M.D. *Id.* at 471. The report, apparently written by Dr. Francis, noted that

Fluker's panic attacks had "decreased in frequency from several daily at their peak . . . to nothing

for the past week." *Id.* According to Dr. Francis, Fluker's "[s]leep also seems to have improved

generally over the past month, though he does occasionally awaken with bad dreams." *Id.* Dr.

Francis' primary diagnosis was panic disorder with agoraphobia, as well as "[a]nxiety states,

other." *Id.* at 472. Dr. Francis noted "modest improvements" in Fluker's panic disorder and

PTSD, though Dr. Francis found it unclear whether this was related to an "improved situation at

home, therapy, meds or some combination of the above." *Id.*

On April 13, 2013, Fluker met with Dr. Boroff, reporting "no improvement in his

symptoms with the change to Effexor." *Id.* at 473. According to Dr. Boroff, Fluker "continue[d] to feel sad, anxious, lethargic, and hopeless." *Id.* Dr. Boroff found that Fluker's mental status "continue[d] to be significant in terms of his flat affect, depressed mood, and poor cognitive functioning." *Id.* Dr. Boroff noted that, per Dr. Francis, Fluker's Effexor dose would continue to be increased "until [Fluker] reache[d] an ideal dose." *Id.*

Fluker's final appointment with Dr. Boroff was on June 25, 2013. *Id.* at 475. Fluker had missed "many of his recent appointments," including ones with Dr. Francis in order to obtain more medication. *Id.* Fluker reported that he was no longer living with his mother, due to feeling uneasy in the home on account of "the constant reminders of his deceased brother." *Id.* Fluker reported no improvement in his symptoms. *Id.*

### 6. Dr. Lisa Kalich

Fluker was referred to evaluating physician Dr. Lisa Kalich, Psy.D. by attorney Nancy McGee to provide an assessment regarding Fluker's eligibility for SSI benefits. AR at 547–53. Dr. Kalich evaluated Fluker on February 26, 2013, which included reviewing Fluker's medical records, conducting a clinical interview with Fluker, and administering the WASI-Fourth Edition ("WASI-IV") test and the Wechsler Memory Scale-III, Abbreviated ("WMS-III-A") test. *Id.*

Fluker arrived to his appointment on time. *Id.* at 550. Dr. Kalich noted that Fluker was neatly groomed and oriented to date, time, and place. *Id.* Fluker's eye contact was good, and his speech was clear and evenly paced. *Id.* at 550. Dr. Kalich noted some evident memory impairment, based on Fluker's difficulty recalling dates and time frames for events in his life. *Id.* Fluker was pleasant and friendly throughout the interview, and while his affect was "relatively flat," he occasionally smiled. *Id.* Fluker reported experiencing severe anxiety since his brother's death in 2001, including flashbacks of his brother's death, rapid heartbeat, difficulty breathing, and nausea. *Id.* at 549. Fluker reported that these symptoms were exacerbated in 2010, when a gunman in an adjacent car shot at him while he was "driving with some friends"; Fluker was not hit by the gunfire. *Id.* Fluker also reported symptoms of depression beginning in 2001, including "chronic periods of sadness, tearfulness, sleep and appetite disturbance, and a history of suicidal ideation." *Id.* Fluker reported "psychotic symptoms, including auditory and visual

16

hallucinations." *Id.* at 551.

Dr. Kalich noted "some concerns about Mr. Fluker's credibility as a reporter, particularly with regard to his use of drugs and alcohol, as records indicate that he has previously reported use of cocaine and amphetamine (which he denied in this current interview)." *Id.* Additionally, Dr. Kalich noted that "information obtained from his treatment records suggests that his last use of ecstasy was much more recent than he acknowledged." *Id.* Fluker stated he had last used ecstasy "three or four years ago" but Dr. Kalich found that, "according to Sausal Creek Outpatient Stabilization Clinic records, Mr. Fluker last used ecstasy on New Year's Eve 2011 and last used cocaine in 2010." *Id.* Dr. Kalich noted that "[b]ecause Fluker [was] currently on probation, he [was] subject to drug testing; however, [Fluker] denied being required to test since his release in 2012." *Id.* Fluker "denied use of alcohol while incarcerated," and reported having last consumed alcohol "a few days [before]," in the form of one beer. *Id.* at 549. Fluker reported using marijuana "almost every day." *Id.* at 549.

Dr. Kalich noted that Fluker's "diagnostic presentation [was] complicated by his substance dependence." *Id.* at 552. She opined that Fluker's inconsistent reports of his substance abuse made it "unclear as to whether he has recently used other types of substances." *Id.* She also opined that Fluker's chronic addictions had "likely exacerbated his mood symptoms and possibly caused some of his psychotic symptoms." *Id.* Dr. Kalich then stated that it was "unlikely that [Fluker's] symptoms [were] the sole product of his [substance] use," because "[Fluker's] mood and psychotic symptoms ha[d] persisted during periods of sobriety (i.e. incarceration) and during his recent period of decreased alcohol use." *Id.* "In fact, Mr. Fluker's substance use likely masked symptoms of depression and anxiety." *Id.* Dr. Kalich opined that, while Fluker currently used marijuana on a daily basis and was "likely dependent on [marijuana]," Fluker's use "does not significantly impact his mental health symptoms; however, his use may contribute to lowered energy and motivation." *Id.*

Dr. Kalich reported a GAF score of 45 and diagnosed Fluker with severe MDD, chronic PTSD, cannabis dependence, and alcohol dependence in sustained partial remission. *Id.* at 552. A WASI-IV test conducted by Dr. Kalich measured Fluker's FSIQ at 70, putting him in the

borderline range of intellectual functioning; Dr. Kalich reported that, were the test to be re-administered, there was a 95% chance that Fluker's FSIQ would fall between 67 and 75. *Id.* Dr. Kalich reported that Fluker "appeared to put forth his best effort" during cognitive testing, "although at times directions had to be repeated." *Id.* at 551.

Dr. Kalich found that Fluker likely experienced moderate to marked impairment with regard to activities of daily living. *Id.* at 553. Dr. Kalich found Fluker's memory functioning to be significantly impaired, which would cause issues in remembering and carrying out complex or detailed instructions. *Id.* at 553. Further, Dr. Kalich found that his borderline intellectual functioning could create difficulty in understanding and responding to a complex work environment. *Id.* Fluker's depression and PTSD were also found to be "impactful with regard to his ability to complete tasks of daily living." *Id.* Fluker reported having difficulty getting out of bed in the morning, and relying on his mother to assist him in daily tasks like "chores, caring for his sons, and preparing meals." *Id.* Dr. Kalich stated that, were Fluker to reside alone, completing these tasks would be overwhelming due to his emotional symptoms. *Id.*

### 7. Dr. Warren T. Taylor

Fluker was referred to evaluating psychologist Warren T. Taylor, Ph.D, by attorney Nancy McGee for a determination as to whether Fluker was eligible for SSI benefits, based on his mental illness. AR at 531–45. Dr. Taylor evaluated Fluker once, on May 1, 2014. *Id.* Dr. Taylor reviewed Fluker's medical record, conducted a Mental Status Examination and comprehensive Pre-Test Interview, and administered the following tests: (1) Bender Visual-Motor Gestalt Test, Second Edition; (2) Trail Making Test; (3) WASI-Fourth Edition ("WASI-IV"); (4) WRAT-3; (5) BAI; and (6) BDI. *Id.*

Dr. Taylor found Fluker to be clean-shaven and "appropriately groomed." *Id.* at 533. Fluker appeared to be fatigued, but did not appear to be under the influence of any illegal drugs or alcohol. *Id.* He was able to communicate effectively, though he would sometimes become "tangential and loquacious," requiring redirection by Dr. Taylor. *Id.* His affect was flat "for the most part," and he appeared to be in an anxious and significantly depressed mood. *Id.*

Fluker stated that his last drink of alcohol at that time had been "a little bit of Corona beer"

18

on April 20th, 2014; he further stated that "the hard stuff" now made his stomach hurt "real bad," and that he now drank "about every four months." *Id.* at 536–37. Fluker also stated that he smoked "a joint a day," and that he had done so since he was in the 7th or 8th grade. *Id.* at 537. Fluker denied using "meth, heroin, needles or any other illegal drugs." *Id.* at 533. Fluker rated his level of depression at five, on a scale of one to ten (ten being "as depressed as a person can become"); Fluker reported having stayed at a five or six since his brother died. *Id.* Fluker rated his level of anxiety at a 6 or 7, and reported that his anxiety increased whenever he was around "a lot of people," which he reported had been the case since his brother died. *Id.* Fluker reported difficulty sleeping, violent nightmares, and "see[ing] little shadows and hear[ing] little whispers sometimes." *Id.*

Dr. Taylor conducted psychological testing with Fluker, which returned a GAF score of 33, leading Dr. Taylor to conclude that Fluker would be unable to work "on a regular and consistent basis within the next 12 to 18 months, if not significantly longer. . . ." *Id.* Dr. Taylor also conducted a WASI-IV test placed Fluker's FSIQ at 86, putting Fluker within the 18th percentile, or low average. *Id.* at 541. Dr. Taylor stated there was a 95% chance that Fluker's true FSIQ falls within the 82–90 range, which would place Fluker somewhere between low average to average. *Id.* A WRAT-3 test scored Fluker's reading ability at the High School grade, which is within the average range for individuals his age. *Id.* at 542. Dr. Taylor reported extreme impairment in Fluker's ability to: (1) carry out short, simple instructions; (2) carry out detailed (complex) instructions; (3) perform activities within a schedule and maintain regular attendance; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; and (5) respond appropriately to changes in work setting. *Id.* at 544. Dr. Taylor also reported marked impairment in Fluker's ability to: (1) understand and remember detailed (complex) instructions; (2) make judgments on simple work-related decisions; and (3) maintain concentration, attention, and persistence. *Id.*

Based on these findings, Dr. Taylor diagnosed Fluker with recurrent MDD, chronic PTSD, Generalized Anxiety Disorder, and a polysubstance dependence on cannabis and alcohol. *Id.* at 543. Dr. Taylor opined that Fluker "will be unable to engage in Substantial Gainful Activity," and

further stated that Fluker did not "have sufficient residual functional capacity to perform any consistent and relevant work at that time." *Id.* at 544. Dr. Taylor also stated that "reports of mild mental retardation in prior evaluations [were] more than likely due to extreme depression and being unmotivated, basically, too depressed to do his best." *Id.* Additionally, Dr. Taylor stated that Fluker's history of substance abuse was "secondary to all of [Fluker's] other mental health diagnoses," and that such abuse is "primarily a [way] for [Fluker] to self-medicate. *Id.* "Overall," Dr. Taylor opined, Fluker's "test results, history and mental status examination indicate that [Fluker] does have severe psychopathology that precludes an effective and consistent work effort." *Id.* Further, Dr. Taylor found that Fluker's test results and Dr. Taylor's diagnoses were "consistent with the diagnoses that were given to him [by] his previous psychologist who performed comprehensive psychological evaluations[,][5] except that he does not have mild mental retardation." *Id.*

Subsequently, Dr. Taylor submitted to the Appeals Council an addendum to his earlier report, based on the May 1, 2014 evaluation.[6] *Id.* at 556. The addendum was written for the purpose of providing "reasons why there may be differences in psychological test results," likely referring to Fluker scoring higher with Dr. Taylor on the WASI-IV and WRAT-3 tests than he had with previous evaluators. *Id.*; *see* 447, 495–96, 552. Dr. Taylor explained that based on his experience with his own clients, "Mr. Fluker included," "there are many reasons why there may be differences in psychological test results" by test takers, which include: (1) taking similar tests within a short time period; (2) not being motivated to do their best (which may be intentional but "more times than not" is due to mental health issues such as motor retardation or depression); (3) lacking rapport with the test administrator; (4) feeling rushed or anxious; (5) or being unmotivated

---

[5] Dr. Taylor does not specify which psychologist he is referring to here. The most recent evaluation Fluker underwent at the time of Dr. Taylor's evaluation would have been conducted by Dr. Kalich, *id.* at 547, but Dr. Kalich's evaluation is absent from Dr. Taylor's list of reviewed medical history, *see id.* at 531. The most recent evaluation on Dr. Taylor's list of reviewed medical records was from Dr. Boroff at the TRUST Clinic. *See id.*

[6] Although the addendum carries the date January 8, *2014*, the Court concludes that this is a typographical error as that date is before Dr. Taylor's initial evaluation. Given that the fax header indicates the addendum was submitted to the SSA on January 9, *2015,* the Court concludes that the date on the addendum was intended to be January 8, 2015.

to "take tests that are still very culturally biased." *Id.* at 556. Dr. Taylor stated that the WRAT-3 reading test is a measure of written decoding, rather than a measure of reading comprehension. *Id.* "Therefore, the fact that Mr. Fluker indicated that he had significant difficulty reading [is] not in conflict with the scores he received on the WRAT-3." Further, Dr. Taylor noted that the only tests Fluker completed by himself were written at a 5th to 6th grade reading level. Dr. Taylor stated that he stood by his conclusions, having "conducted thorough testing with Mr. Fluker, over several days, and based [his] opinion on the whole of the experience using [his] professional expertise, having been in practice over 24 years." *Id.*

### E. The Hearing

ALJ Richard B. Laverdure held a hearing regarding Fluker's SSI claim on July 9, 2014. AR at 28–58. Present at the hearing was Fluker, represented by attorney Nancy McGee, and Vocational Expert Jo Ann Yoshioka. *Id.* at 30. At the outset, Ms. McGee noted two exhibits that had not yet been entered into evidence: (1) Dr. Kalich's psychological evaluation of Fluker; and (2) Dr. Lebeck's addendum to her original psychological evaluation of Fluker. *Id.* at 30–33. The transcript of the hearing notes that those exhibits were received into evidence and made part of the record. *Id.* at 33.

Fluker was first examined by the ALJ. *Id.* at 37–44. When questioned by the ALJ about his prior work history, Fluker reported that he had last worked in 2001 or 2002, but that he didn't "know exactly." *Id.* at 37. Fluker stated that his prior jobs were "[m]ostly part time." *Id.*

Fluker reported last being incarcerated in Santa Rita jail for "receiving stolen property"; Fluker was unsure of whether this was in 2012 or 2013, but confirmed that he was incarcerated for ninety days. *Id.* at 38. Fluker stated that, prior to that time, his last period of incarceration was "[maybe] five, six years before that," which lasted either thirty or forty-five days, for what he believed was a probation violation. *Id.* Fluker stated he was on probation for domestic violence. *Id.* Fluker, when asked about any other criminal convictions, reported his first conviction in 1998, for possession of marijuana. *Id.* Fluker denied having been incarcerated since June of 2012. *Id.* at 39.

Fluker reported that, for the past two years, he had been living "[m]ainly with [his] mother

and dad." *Id.* He denied being in school or taking classes. *Id.* Fluker stated that he did "[p]retty much nothing" with his time, and that he tried "to spend time with [his] kids when [he] [could]." *Id.*

Fluker denied still using "street drugs." *Id.* at 40. The ALJ asked Fluker when he had last "used any street drugs, including marijuana." *Id.* As to marijuana, Fluker admitted to having a "marijuana card" to help him with "[his] appetite and [his] resting," as well as his depression "a little bit . . . ." *Id.* With regard to other "street drugs," Fluker reported that it had "been a while," later stating he had last used street drugs "[m]aybe three or four years" ago. *Id.* at 43. The ALJ asked what Fluker had been using, to which Fluker replied, "I drank heavily, and I took [e]cstasy . . . and that's pretty much it." *Id.* at 43. The ALJ asked whether Fluker had used heroin, to which Fluker replied, "I've tried it . . . ." *Id.* The ALJ then asked whether Fluker had used cocaine or meth; Fluker denied using either substance. *Id.* The ALJ then asked Fluker, "[s]o I won't find anything in any of your medical records here, or anywhere else, that says you'd been using any kind of street drugs for at least three years, is that correct?" *Id.* Fluker replied, "Yes." *Id.* The ALJ noted later in the hearing that TRUST Clinic records from 2013, the year before the hearing, indicated that Fluker had been a current drug user at that time. *Id.* at 53; *see id.* at 442–76. The ALJ asked Fluker why that was the case, to which Fluker replied that he did not know. *Id.* at 53. Fluker stated that, when he was going to the TRUST Clinic, "we never talked about drugs." *Id.*

Fluker reported having taken the following medications: (1) Trazodone, "for sleeping"; (2) Risperdal; (3) Zoloft; and (4) Seratine, which he believed had "something to do with maybe hearing voices." *Id.* at 41. Fluker also reported that Dr. Boroff at the TRUST Clinic had switched him off Zoloft to another medication, *id.* at 42, likely referring to Effexor, *see id.* at 455. Fluker stated that he had not taken any medication "in a while"; when asked why by the ALJ, Fluker's reply was that he had not "been able to get into a doctor" and that he was "just trying to go at it from a different angle with it maybe." *Id.* Fluker reported that the TRUST Clinic would no longer see him because he had missed appointments too many times. *Id.* at 42–43. Fluker stated that he missed so many appointments because of "bad timing and [his] memory. It's just gone." *Id.* at 43. He also testified that he hadn't "been able to get in to a doctor." *Id.* at 42.

22

Fluker was then examined by his attorney, Nancy McGee. *Id.* at 44–53. Fluker reported having trouble "falling asleep, and then staying asleep" because of bad dreams and nightmares that were about "[m]ainly dying and re-seeing [his] brother get[ting] shot." *Id.* at 45. Fluker also reported hearing voices sometimes, which he described as "[s]ort of mumbling words . . . ." *Id.* Ms. McGee asked Fluker whether certain things made him "nervous or agitated"; Fluker replied that "[y]es, being around a lot of people sometimes that I do know, sometimes that I don't know." *Id.* at 45. Fluker also reported having flashbacks about his brother's death "[a]ll the time, every day." *Id.* Fluker, in response to Ms. Mcgee's question regarding how he felt about his treatment at the TRUST Clinic, stated that, because of having to "relive and re-talk about the events that [he] had already talked about . . . [he] would leave feeling worse than [he] did when [he] went in, and [he] got tired of crying, and just feeling bad for the rest of the day." *Id.* at 47.

Fluker then stated that he decided not to take his medication anymore for two reasons. First, Fluker's mother had "a thing about seeing [Fluker] with all those pill bottles," which Fluker attributed to his mother "look[ing] at it like [Fluker] [was] taking drugs." *Id.* Second, Fluker didn't "want to just keep taking all these medicines, and all these pills. Like my stomach bothers me every morning. I get queasy a lot." *Id.* Fluker testified that he could not "continue just taking six, five different medications every day for the rest of [his] life," and further stated that he did not think that was healthy. *Id.* Fluker stated that he believed Trazodone and Zoloft had helped "as far as the depression," but that he "didn't see a change" from taking the other medications. *Id.* at 48.

The ALJ asked Fluker if either his mother or father had told Fluker not to take his prescribed medication; Fluker replied that they had not, but stated, "I don't want my mom to look down on me." *Id.* at 49. Fluker represented believing that his mother disapproved of him "just taking medication thinking that I have -- thinking that I might abuse it maybe." *Id.* at 50. The ALJ asked Fluker if his mother approved of his use of cannabis, to which Fluker replied, "Yes." *Id.* The ALJ then told Fluker that "your records do say you've used cocaine in the past, which you told me you didn't today." *Id.*

Fluker reported barely graduating high school, to which Ms. McGee asked, "[w]hat do you mean barely?" *Id.* at 51. Fluker replied that he had done "real bad" during the last semester, but

his principal and teachers "basically took a vote and they passed me," which Fluker said would not have happened if it hadn't been for Fluker's science teacher saying that he had "showed some improvement." *Id.*

Ms. McGee then asked Fluker why he thought he had "drank so much and used the assortment of drugs that [Fluker] did for a long time"; Fluker replied that he had done so because he felt lonely and frustrated after the death of his brother. *Id.* at 51–52. Ms. McGee then asked why he had decided to cut back on his drug and alcohol use, with the exception of marijuana. *Id.* Fluker replied that he could no longer drink alcohol because it hurt his stomach, possibly due to ulcers or "some type of stomach problem," and as for drugs, he stated that "I don't feel the need to get high, and I don't like that. I don't like the feeling. I don't like it." *Id.* at 52–53.

The ALJ then asked about Fluker's having been cleared to work while at Santa Rita Jail. *Id.* Fluker reported that "[a]t Santa Rita Jail they make you work." *Id.* Fluker further stated that, when Santa Rita Jail says "cleared [for work], they mean they want you to pee in a bottle and make sure you don't have any type of sexually transmitted disease." *Id.* at 55. Fluker stated that "[y]ou could have a broke leg and you have to go to the kitchen, and if you don't go, you get extra time, and then you get put in a different section of the jail, so you have to go." *Id.* The ALJ then asked how Fluker did at his job, to which Fluker replied, "Poorly." *Id.* Ms. McGee then asked Fluker how many days, and hours per day, he worked at the Santa Rita Jail; Fluker stated that he worked "six maybe" hours a day, four days a week. *Id.* at 56.

The ALJ then noted that, while there was "some sporadic work back about 2000 time frame," there was "no past relevant work here apparently." *Id.* The ALJ asked Ms. McGee whether Fluker had any physical impairments that met "the severity requirement," to which Ms. McGee replied that there were not. *Id.*

### F. ALJ Analysis and Findings of Fact

#### 1. Legal Standard for Disability Analysis

Disability insurance benefits are available under the Social Security Act when an eligible claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 423(a)(1). A claimant is only found disabled if his physical or mental impairments are of such severity that he is not only unable to do his previous work but also "cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The claimant bears the burden of proof in establishing a disability. *Gomez v. Chater*, 74 F.3d 967, 970 (9th Cir. 1996). Where, as here, the claimant has previously been denied benefits, he must "overcome the presumption of continuing non-disability [by] prov[ing] 'changed circumstances' indicating a greater disability." *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). The "changed circumstances" requirement can be satisfied by a "change in the claimant's age category under 20 CFR 404.1563 or 416.963, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not previously considered, or a change in the criteria for determining disability." Acquiescence Ruling 97-4(9), 1997 WL 742758 at *3. If the presumption is not rebutted, the ALJ must determine that the claimant is not disabled. *Id.*

   a. Five-Step Analysis

  The Commissioner has established a sequential five-part evaluation process to determine whether a claimant is disabled under the Social Security Act. 20 C.F.R. § 404.1520(a). At Step One, the Commissioner considers whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If he is, the Commissioner finds that the claimant is not disabled, and the evaluation stops.

  If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to Step Two and considers whether the claimant has "a severe medically determinable physical or mental impairment," or combination of such impairments, which meets the duration requirement in 20 C.F.R. § 404.1509. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant does not have a severe impairment, disability benefits are denied at this step.

  If it is determined that one or more impairments are severe, the Commissioner will next perform Step Three of the analysis, comparing the medical severity of the claimant's impairments

United States District Court
Northern District of California

to a compiled listing of impairments that the Commissioner has found to be disabling. 20 C.F.R. § 404.1520(a)(4)(iii). If one or a combination of the claimant's impairments meet or equal a listed impairment, the claimant is found to be disabled. Otherwise, the Commissioner proceeds to Step Four and considers the claimant's residual functional capacity ("RFC") in light of his impairments and whether he can perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); 20 C.F.R. § 404.1560(b). If the claimant can still perform past relevant work, he is found not to be disabled.

If the claimant cannot perform past relevant work, the Commissioner proceeds to the fifth and final step of the analysis. 20 C.F.R. § 404.1520(a)(4)(v). At Step Five, the burden shifts to the Commissioner to show that the claimant, in light of her impairments, age, education, and work experience, can perform other jobs in the national economy. *Johnson v. Chater*, 108 F.3d 178, 180 (9th Cir. 1997). A claimant who is able to perform other jobs that are available in significant numbers in the national economy is not considered disabled, and will not receive disability benefits. 20 C.F.R. § 404.1520(f). Conversely, where there are no jobs available in significant numbers in the national economy that the claimant can perform, the claimant is found to be disabled. *Id.*

### b. Mental Impairment Analysis

Where there is evidence of a mental impairment that allegedly prevents a claimant from working, the Social Security Administration has supplemented the five-step sequential evaluation process with additional regulations to assist the ALJ in determining the severity of the mental impairment. *Clayton v. Astrue*, 2011 WL 997144, at *3 (E.D. Cal. Mar. 17, 2011) (citing 20 C.F.R. §§ 404.1520a, 416.920a). These regulations provide a method for evaluating a claimant's pertinent symptoms, signs, and laboratory findings to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(a). In conducting this inquiry, the ALJ must consider all relevant and available clinical signs and laboratory findings, the effects of the claimant's symptoms, and how the claimant's functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment. 20 C.F.R. § 404.1520a(c)(1). The ALJ must then assess the degree of the claimant's functional limitations based on the individual's impairments. 20 C.F.R. § 404.1520a(c)(2).

Although analysis under 20 C.F.R. § 404.1520a includes an assessment of the individual's limitations and restrictions, this is not a residual functional capacity assessment but rather a component of analyzing the severity of mental impairments at Steps Two and Three of the sequential evaluation process. SSR 96-8p. The mental residual functional capacity assessment used at Steps Four and Five requires a more detailed assessment in which the ALJ must address the various functions contained in the broad categories found in Paragraph B of the adult mental disorders listed in section 12.00 of the Listing of Impairments. *Id.* The listings that are relevant to Fluker's claimed mental disabilities are 12.04, 12.06 and 12.09.

Disorders related to depression are governed by Listing 12.04, for affective disorders. That listing provides in relevant part:

> Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
>
> a. Anhedonia or pervasive loss of interest in almost all activities; or
>
> b. Appetite disturbance with change in weight; or
>
> c. Sleep disturbance; or
>
> d. Psychomotor agitation or retardation; or
>
> e. Decreased energy; or
>
> f. Feelings of guilt or worthlessness; or
>
> g. Difficulty concentrating or thinking; or
>
> h. Thoughts of suicide; or
>
> i. Hallucinations, delusions, or paranoid thinking; or
>
> [subparts A.2 and A.3 discuss symptoms of manic or bipolar

syndromes];

AND

B. Resulting in at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpt. P, App. 1. Listing 12.06, for anxiety-related disorders, provides as follows:

> In these disorders anxiety is either the predominant disturbance or it is experienced if the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied.
>
> A. Medically documented findings of at least one of the following:
>
> > 1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:

a. Motor tension; or

b. Autonomic hyperactivity; or

c. Apprehensive expectation; or

d. Vigilance and scanning; or

2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or

3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or

4. Recurrent obsessions or compulsions which are a source of marked distress; or

5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;

AND

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

OR

C. Resulting in complete inability to function independently outside the area of one's home.

*Id.*

At the time of the ALJ's decision, Listing 12.09 provided as follows:

Substance Addiction Disorders: Behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.

The required level of severity for these disorders is met when the requirements in any of the following (A through I) are satisfied.

A. Organic mental disorders. Evaluate under 12.02.

29

B. Depressive syndrome. Evaluate under 12.04.

C. Anxiety disorders. Evaluate under 12.06.

D. Personality disorders. Evaluate under 12.08.

E. Peripheral neuropathies. Evaluate under 11.14.

F. Liver damage. Evaluate under 5.05.

G. Gastritis. Evaluate under 5.00.

H. Pancreatitis. Evaluate under 5.08.

I. Seizures. Evaluate under 11.02 or 11.03.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (effective February 26, 2014 to December 8, 2014).

Where the listings refer to "marked" limitations, "it means more than moderate but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App. 1 at 12.00(C).

### c. Consideration of Drug or Alcohol Abuse

The Commissioner must also consider whether drug or alcohol abuse is a contributing factor to the determination that an individual is disabled. A claimant will not be deemed "disabled" if alcoholism is a "contributing factor material to the Commissioner's determination of disability." 42 U.S.C. § 423(d)(2)(C). "In making this determination, [the Commissioner] will evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the Commissioner determines that the claimant's remaining limitations would not be disabling, then the Commissioner must find that the claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability. *See* 20 C.F.R. §§ 404.1535(b)(2)(i), 416.935(b)(2)(i). If the Commissioner determines that the claimant's remaining limitations are disabling, then the Commissioner must find that the claimant is disabled, independent of his or her drug addiction or alcoholism, and that the claimant's addiction or

United States District Court
Northern District of California

alcoholism is not a contributing factor material to the determination of disability. *See* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii).

### 2. ALJ's Application of the Five-Factor Test

#### a. Whether Prior Denial of Disability Benefits is Binding

The ALJ first addressed the implications of Fluker's prior denial of benefits. AR at 16. The ALJ found that that decision was final and binding, AR at 13, but that the presumption of continuing nondisability that arises under *Chavez v. Bowan*, 844 F.2d 691 (9th Cir. 1988) based on a prior finding of nondisability was rebutted by "'changed circumstances' (fewer impairments." AR at 14. .

#### b. Step One: Substantial Gainful Activity

Next, the ALJ addressed whether Fluker engaged in substantial gainful activity since the application was filed, on August 3, 2012. AR at 16. The ALJ found that he had not.[7] *Id.* Having found that Fluker had not been engaged in substantial gainful activity during the relevant period, the ALJ proceeded to step two of the analysis.

#### c. Step Two: Severe Impairments

At Step Two, the ALJ concluded that Fluker "has the following severe impairments: depression, [PTSD], and polysubstance abuse." AR at 16. He concluded the "former foot injury" that was considered severe in the prior disability determination was no longer severe. *Id.*

#### d. Step Three: Medical Severity

At Step Three, the ALJ found that Fluker's impairments, including the substance use disorder, met listings 12.04, 12.06, and 12.09 in 20 C.F.R. Part 404, Subpart P, Appendix 1. AR at 16. The ALJ found that the criteria of Paragraph A were satisfied because Fluker had hallucinations, paranoia, sleeping difficulties, attention difficulties, depression, and anxiety. *Id.* The ALJ then found that Fluker's mental impairments satisfied Paragraph B because they caused

---

[7] As discussed above, the proper inquiry is whether claimant has engaged in substantial gainful activity since the alleged onset date, which in this case was June 13, 2012. The ALJ offers no explanation for using the application date at this step of the analysis. As there is no evidence in the record that Fluker engaged in any gainful activity between June 13, 2012 and August 3, 2012, this error is harmless.

at least two "marked" limitations, or one "marked" limitation and "repeated" episodes of decompensation. *Id.* Specifically, the ALJ found that, taking in consideration Fluker's "drug and alcohol abuse," Fluker had: (1) moderate limitations in activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) "one or two repeated episodes of decompensation, each of extended duration." *Id.* With respect to listing 12.09, which addresses polysubstance abuse, the ALJ stated that his finding was based on Fluker's performance during evaluations with Drs. Boroff, Kalich, and Taylor, "and on his history of drug abuse." *Id.* at 17.

Next, the ALJ found that if Fluker "ceased substance use," the remaining limitations would cause "more than a minimal impact on [Fluker's] ability to perform basic work activities," such that Fluker would continue to have a severe impairment or combination of impairments. *Id.* The ALJ based this finding on "the limited weight assigned to the evaluations by Drs. Kalich and Taylor." *Id.*

Finally, the ALJ concluded that if Fluker ceased substance use, he would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, including 12.04, 12.06, and 12.09. *Id.* "Taking into consideration [Fluker's] likely functioning in the absence of drug and alcohol abuse," the ALJ found the following limitations under Paragraph B: (1) mild limitations in activities of daily living; (2) mild to moderate difficulties in maintaining concentration, persistence, or pace; and (3) no episodes of decompensation, "each of extended duration." *Id.* The ALJ stated that this conclusion was based on "an assessment of the longitudinal record." *Id.* As the remaining limitations would not cause two "marked" limitations or one "marked" limitation and repeated episodes of decompensation, the ALJ found that the Paragraph B criteria had not been satisfied. *Id.* The ALJ then stated that he "considered whether the 'Paragraph C' criteria of 12.04 or 12.06 would be satisfied," and found that "these criteria would not be met if [Fluker] ceased substance abuse." *Id.*

e. Step Four: Residual Functional Capacity

At Step Four, the ALJ concluded that, if Fluker ceased substance abuse, he would have the

RFC to perform "a full range of work at all exertional levels, but with the following nonexertional limitations: he could perform at least simple, routine work." AR at 17. The ALJ stated that, in reaching this conclusion, he considered "all symptoms and the extent to which these symptoms reasonably can be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 416.929 and SSRs 96-4p and 96-7p. *Id.* He also considered "opinion evidence in accordance with the requirements of 20 CFR 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p." *Id.* In evaluating Fluker's symptoms, the ALJ applied a two-step analysis. *Id.* at 18. First, the ALJ asked "whether there is an underlying medically determinable physical or mental impairment(s) . . . that reasonably could be expected to produce the claimant's pain or other symptoms." *Id.* Second, once such an impairment was determined to be shown, the ALJ evaluated "the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to do basic work activities." *Id.* The ALJ applied the rule that "whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, [the ALJ] must make a finding on the credibility of the statements based on a consideration of the entire case record." *Id.*

With respect to Fluker's symptoms, the ALJ found that "if [Fluker] ceased substance use . . . the medically determinable impairments reasonably could be expected to produce the symptoms alleged to some degree . . . ; however, [Fluker's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment . . . ." *Id.*

The ALJ first considered the medical record related to Fluker's claims. The ALJ noted that, while incarcerated from August 28, 2012 through "about" November 24, 2012, Fluker was provided with medication for his depression, spent his time sleeping and reading, and reported no hallucinations. *Id.* at 18 (citing Exh. B-7F). Once released, Fluker sought mental health services and medication from Trust Clinic for "about six or seven months" through June 2013. *Id.* (citing Exhs. B-9F, B-11F). The ALJ noted that the record contains no evidence of treatment of any kind since then. *Id.* Finally, the ALJ stated that Fluker was evaluated for the purpose of applying for

33

Social Security benefits in February 2013 and again in 2014. *Id.*

Turning to Fluker's interactions with Dr. Boroff at Trust Clinic, the ALJ noted that Fluker apparently told Dr. Boroff that he could not read, *id.* (citing Exhibit B-9F), which the ALJ found to be false, based on "the report from jail and the evaluations by Drs. Kalich and Taylor," *id.* (citing Exhs. B-20F, B-21F). The ALJ also found that Dr. Boroff was "led to believe by [Fluker] that he was regularly tested for substance abuse" when, in a subsequent evaluation with Dr. Kalich, Fluker stated he had not been drug tested since his release. *Id.* Citing "the other evidence," the ALJ found that Fluker had exaggerated his symptoms and substantially underachieved on testing with Dr. Boroff. *Id.* at 18–19. The ALJ found Dr. Boroff's credibility "significantly undermined," and stated that "no weight can be assigned to Dr. Boroff's opinion, because it is contradicted in large part by the more recent evaluations by both Dr. Kalich and Dr. Taylor, and, of course, by the actual facts about the claimant's abilities, symptoms, and drug use." *Id.* at 19.

The ALJ then considered Fluker's evaluation by Dr. Kalich, finding that little weight could be assigned to her opinion "because Dr. Kalich had to rely on the claimant's subjective statements for much of her conclusion and the inferences she drew [were] not consistent with the longitudinal record." *Id.* The ALJ found Dr. Kalich's opinion "almost entirely engulfed by uncertainty, contradictory facts, and lack of corroboration . . . ." *Id.* at 20. The ALJ based this finding on "later evidence" showing Fluker's intellectual capacity was higher than his performance on Dr. Kalich's evaluation. *Id.* In addition, the ALJ found "considerable reason to believe that he misrepresented his other symptoms" and that, because while incarcerated Fluker received medication, had no hallucinations, and spent his time reading and working in the kitchen, "a reasonable inference [was] that in the absence of drugs and alcohol, [Fluker's] symptoms would not have precluded work activity." *Id.*

The ALJ then turned to Dr. Taylor's opinion, according it little weight because "to the extent Dr. Taylor formed his opinion based on the subjective statements from [Fluker], he was also misled." *Id.* Specifically, the ALJ found that at the administrative hearing Fluker "spoke articulately and with great thoroughness about his history, indicating good cognition and no

34

appreciable interference from his alleged symptoms." *Id.* The ALJ also found that Fluker

minimized his substance use history, telling Dr. Taylor that he "never used meth, heroin, needles

or any other illegal drugs," when other records, including admissions to Dr. Kalich, indicated that

he did use these drugs "over the years." *Id.*

The ALJ also noted that Fluker's achievement of an IQ score of 86 (low average) with Dr.

Taylor was "far higher than when tested before." *Id.* at 20. He cited three exhibits containing past

test results: 1) a psychological report dated February 2, 2012, by Dr. Puran Khalsa (finding that

Fluker's IQ was in the "extremely low range" and scoring his Mini-Mental State Exam at 14/30),

AR at 353-359; 2) a psychological report dated 10/21/20 by Dr. Sherry Lebeck finding his IQ to

be 67, AR at 491-498 ; and 3) a psychological evaluation dated February 26, 2013, by Dr. Lisa

Kalich finding his IQ to be 70, AR at 547-553. *Id.* The ALJ concluded that the higher IQ score

Fluker received when Dr. Taylor tested him indicated that Fluker "likely misrepresented his

cognitive ability before and, if he told the truth that he no longer used any substances besides

cannabis, demonstrated that in the absence of most substance abuse, his capability greatly

improved." *Id.*

Summarizing his findings, the ALJ found that Fluker "sought mental health treatment for

only a short period and misrepresented himself to his treating source, Dr. Boroff, thus greatly

reducing the chance of any benefit from the treatment." *Id.* at 20. According to the ALJ, Fluker

"then misrepresented his symptoms to both Dr. Kalich and Dr. Taylor, greatly limiting their ability

to produce a fair and accurate evaluation of his mental condition." *Id.* The ALJ found that Fluker

"continued to use at least cannabis, but without drug testing there is no reason to believe he has

not continued to use other substances," and that "while incarcerated and presumably clean and

sober, he was able to work at nearly a full-time schedule." *Id.* The ALJ then concluded that "the

evidence submitted by [Fluker] does not show that his symptoms would persist in the absence of

drugs and alcohol. To the contrary, he demonstrated, in the evaluation with Dr. Taylor and in his

ability to work while incarcerated, that in all likelihood, his ability to perform work activity would

be intact in the absence of drugs and alcohol." *Id.*

The ALJ then explained the basis for his conclusion that in the absence of substance use

Fluker had not demonstrated that his symptoms would meet the requirements of a listing, stating that he had looked to SSR 13-2p which establishes the following six-part framework for making that determination: (1) Does the claimant have drug addiction and alcoholism ("DAA")? (2) Is the claimant disabled considering all impairments, including DAA? (3) Is DAA the only impairment? (4) Is the other impairment(s) disabling by itself while the claimant is dependent upon or abusing drugs or alcohol? (5) Does the DAA cause or affect the claimant's medically determinable impairment(s)? and (6) Would the other impairment(s) improve to the point of non-disability in the absence of DAA? *Id.* at 20–21. At part one, the ALJ concluded that "the medical evidence proves that [Fluker] has a long history of use of alcohol, cannabis, and other drugs, including ecstasy. He admitted to such history to evaluators and in testimony." *Id.* At part two, the ALJ found that, "taking all factors into consideration, [Fluker's] symptoms meet the requirements of Sections 12.04, 12.06, and 12.09." *Id.* At part three, the ALJ found that DAA was not Fluker's only impairment, noting that "the record indicates [Fluker] has underlying depression and [PTSD]." *Id.* At part four, the ALJ stated that the answer was "No." *Id.* at 21. At part five, the ALJ found that "based on the evidence from the treating and evaluating sources, the claimant's substance abuse greatly affects the severity of his other impairments." *Id.* At part six, the ALJ concluded that "[b]ased on the claimant's greatly improved performance on testing with Dr. Taylor and his ability to work nearly full time while incarcerated and presumably not using drugs or alcohol, it is reasonable to conclude that [Fluker's] depressive and other symptoms would improve (and have improved) to the point of non-disability in the absence of DAA." *Id.*

Step Four of the Five-Factor test also requires an analysis of whether a claimant is able to perform past relevant work. The ALJ found Fluker had past work as "a handler security guard, and a bagger, but it appears that he did not earn at the substantial gainful activity level while performing this work." *Id.* (citing Exh. B-14D). Therefore, the ALJ concluded that Fluker's past work was not "relevant" for the purposes of the step four analysis. *Id.*

### f. Step 5: Ability to Perform Other Jobs in the National Economy

Under Step Five, the ALJ considered whether there was a significant number of jobs in the national economy that Fluker could have performed, taking into account Fluker's age, education,

work experience, and RFC in conjunction with the Medical-Vocational Guidelines. *See* AR at 21–22. The ALJ found that Fluker was 31 years old on the date the application was filed, which placed him in the category of younger individual age 18-49. *Id.* at 21. The ALJ also found that Fluker had at least a high school education, was able to communicate in English, and that transferability of job skills was not an issue because Fluker had no past relevant work. *Id.*

The ALJ found that "if [Fluker] ceased substance abuse, his ability to perform work at all exertional levels would be compromised by nonexertional limitations." *Id.* at 22. The ALJ then stated that "these limitations have little or no effect on the occupational base of unskilled work at all exertional levels." *Id.* The ALJ thus found that "[a] finding of 'not disabled' is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines." *Id.* Citing "the table rules in Appendix 2," the ALJ stated that the occupational base of persons with solely nonexertional impairments "cuts across exertional categories through heavy (and very heavy) work and will include occupations above the unskilled level is a person has skills transferrable to skilled and semiskilled occupations within his or her RFC. *Id.* (citing SSR 85-15).

The ALJ finally concluded that Fluker's substance use disorder was a contributing factor material to the determination of disability because the claimant would not be disabled if he ceased substance use. *Id.* Because of this, the ALJ found that Fluker had not been disabled with the meaning of the Social Security Act at any time from the date the application was filed through the date of the ALJ's decision. *Id.*

### G. Contentions of the Parties

In the Motion, Fluker contends the Commissioner's decision should be overturned because the ALJ erred in the following respects: 1) the ALJ did not give proper weight to the opinions of his treating and examining doctors and in particular, the opinions of Drs. Boroff, Taylor, Khalsa and Lebeck; 2) the ALJ's RFC was not supported by substantial evidence; 3) the ALJ erred in finding that Fluker's substance abuse was material and that he did not meet a listing in the absence of substance abuse; and 4) the ALJ did not provide adequate reasons to support his credibility finding as to Fluker's testimony.

The Commissioner contends the ALJ properly weighed the medical evidence, that his RFC

was supported by substantial evidence, that he correctly found that Fluker's substance abuse was material and that he provided sufficient reasons to support his finding that Fluker's testimony was not credible.

## III.  ANALYSIS

### A.  Legal Standard Under 42 U.S.C. § 405(g)

When asked to review the Commissioner's decision, the Court takes as conclusive any findings of the Commissioner which are free from legal error and supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be based on the record as a whole. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Substantial evidence means "more than a mere scintilla," *id.*, but "less than a preponderance." *Desrosiers v. Sec'y of Health & Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). Even if the Commissioner's findings are supported by substantial evidence, they should be set aside if proper legal standards were not applied when weighing the evidence and in reaching a decision. *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978).

In reviewing the record, the Court must consider both the evidence that supports and detracts from the Commissioner's conclusion. *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985)). "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005). Courts "are constrained to review the reasons the ALJ asserts" and "cannot rely on independent findings" to affirm the ALJ's decision. *Connett v. Barnhart*, 340 F.3d 871, 874 (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

If the Court identifies defects in the administrative proceeding or the ALJ's conclusions, the Court may remand for further proceedings or for a calculation of benefits. *Garrison v. Colvin*, 759 F.3d 995, 1019-1021 (9th Cir. 2014).

### B.  Application of Res Judicata Based on Prior Finding of Nondisability

"The principles of res judicata apply to administrative decisions, although the doctrine is applied less rigidly to administrative proceedings than to judicial proceedings." *Chavez*, 844 F.2d

at 693 (citing *Lyle v. Secretary of Health & Hum. Servs.,* 700 F.2d 566, 568 n. 2 (9th Cir. 1983)).

"The claimant, in order to overcome the presumption of continuing non-disability arising from the first administrative law judge's findings of non-disability, must prove 'changed circumstances' indicating a greater disability." *Chavez,* 844 F.2d at 693 (quoting *Taylor v. Heckler,* 765 F.2d 872, 875 (9th Cir.1985)); *see also* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3 ("A claimant may rebut the presumption by showing a 'changed circumstance' affecting the issue of disability with respect to the unadjudicated period, e.g., a change in the claimant's age category under 20 CFR 404.1563 or 416.963, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not previously considered, or a change in the criteria for determining disability.")

Even when a claimant rebuts the continuing presumption of non-disability required by *Chavez* after a prior final decision by an ALJ, effect must still be given to certain findings contained in the prior ALJ's decision, including findings in the sequential evaluation process for determining disability. *See* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3. In Acquiescence Ruling 97-4(9), the SSA explains this rule as follows:

> If the claimant rebuts the presumption, adjudicators then must give effect to certain findings . . . contained in the final decision by an ALJ or the Appeals Council on the prior claim, when adjudicating the subsequent claim. For this purpose, this Ruling applies only to a finding of a claimant's residual functional capacity, education, or work experience, or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, or a finding required under the evaluation process for determining disability provided under 20 CFR 404.1578, as appropriate, which was made in the final decision on the prior disability claim. Adjudicators must adopt such a finding from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id.*

Here, the ALJ found that Fluker had rebutted the presumption of ongoing nondisability under *Chavez* by demonstrating changed circumstances. The parties did not challenge the ALJ's finding on this issue and therefore the Court does not address it here.

**C.    Did the ALJ Give Proper Weight to the Opinions of Drs. Boroff, Taylor, Khalsa and Lebeck**

**1.    Legal Standards Governing Weight to Be Afforded Opinions of Physicians**

"Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)."[8] *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1996); 20 C.F.R. § 416.927(d).  "[T]he opinion of a treating physician is . . . entitled to greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a non-examining physician." *Garrison*, 759 F.3d at 1012.  The medical opinion of a claimant's treating physician is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2).  When a treating physician's opinion is not controlling, it is weighted according to factors such as the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency with the record, and specialization of the physician.  20 C.F.R. § 404.1527(c)(2)–(6).

Where a treating or examining physician's opinion is not contradicted by another doctor, an ALJ may reject it only for clear and convincing reasons that are supported by substantial evidence. *Ryan v. Comm'r of Soc'l Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (citations omitted).  Even when contradicted by another doctor, such opinions may only be rejected for specific and legitimate reasons supported by substantial evidence in the record.  *Id.*  The Ninth Circuit has recently emphasized the high standard required for an ALJ to reject an opinion from a treating or examining doctor, even where the record includes a contradictory medical opinion:

> "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial

---

[8] Psychologists' opinions are subject to the same standards as physicians' opinions.  *See* 20 C.F.R. § 404.1527(a)(2); *Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir. 2009) (applying standards discussing physicians' opinions to evaluate an ALJ's treatment of a psychologist's opinion).

evidence." *Id.* This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be "entitled to the greatest weight . . . even if it does not meet the test for controlling weight." *Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). An ALJ can satisfy the "substantial evidence" requirement by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* (citation omitted).

Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs. *See Nguyen v. Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996). In other words, an ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion. *See id.*

*Garrison*, 759 F.3d at 1012−13 (footnote omitted). Courts may only consider only the reasons provided by the ALJ in the disability determination and may not affirm the ALJ on grounds upon which he did not rely. *Id.* at 1010 (citation omitted).

### 2. The ALJ Erred in Assigning Dr. Boroff's Opinion No Weight

#### a. Background

Fluker contends the ALJ erred in giving no weight to the opinion of treating physician Dr. Boroff and that the ALJ was required to articulate at least specific and legitimate reasons for rejecting his opinion, which the ALJ did not provide. According to Fluker, the ALJ's broad statement that Dr. Boroff's opinion was contradicted by "the actual facts about the claimant's abilities, symptoms and drug use," AR at 19, does not meet that standard. Nor is the ALJ's reliance on purportedly conflicting opinions of Drs. Kalich and Taylor a legitimate reason for discounting Dr. Boroff's opinion, Fluker asserts, as all three doctors diagnosed Fluker with MDD and PTSD and also agreed that his use of alcohol and drugs was not the cause of his mental health impairments. Finally, the ALJ's reliance on Fluker's lack of credibility also wasn't a proper basis for rejecting Dr. Boroff's opinions, Fluker contends.

#### b. Discussion

As a treating physician who met with Fluker seven times between November 29, 2012 and

June 25, 2013, Dr. Boroff's opinion was entitled to substantial weight unless (1) the ALJ presented clear and convincing reasons to reject it, supported by substantial evidence, or (2) it was contradicted by other medical opinions and the ALJ provided specific and legitimate reasons to reject it, supported by substantial evidence, s*ee Ryan*, 528 F.3d at 1198. The ALJ assigned no weight to Dr. Boroff's opinion on the basis that it "was contradicted in large part by the more recent evaluations by both Dr. Kalich and Dr. Taylor." *Id.* at 18–19. The ALJ did not identify the specific contradictions upon which he relied and the Court does not find the opinions of these physicians to be contradictory in any significant way. At most, their opinions appear to reflect variations over time that are characteristic of Fluker's mental impairments as well as the variations that may occur in psychological test results, as explained by Dr. Taylor. Therefore, the Court concludes the ALJ was required to provide clear and convincing reasons for rejecting Dr. Boroff's opinions. Even if the ALJ was required to provide only specific and legitimate reasons for Dr. Boroff's opinion, however, he did not meet that standard.

The vague statement that "of course" Dr. Boroff's opinions were contradicted by "the actual facts about the claimant's abilities, symptoms and drug use," AR at 19, provides no useful explanation of the failure of the ALJ to give controlling weight to the opinion of a doctor who treated Fluker on numerous occasions over the period of approximately a year, starting soon after his alleged onset date. Moreover, the ALJ's reliance on the allegedly contradictory opinions of Drs. Kalich and Taylor is not sufficient because the ALJ fails to identify the specific contradictions to which he refers. As discussed above, the Court concludes that the opinions of these doctors are not obviously inconsistent with the opinion of Dr. Boroff. The ALJ's reliance on the opinions of Drs. Kalich and Taylor as a basis for discounting Dr. Boroff's opinions is also questionable to the extent that the ALJ later concluded that the opinions of Drs. Kalich and Taylor were themselves entitled to little weight. AR at 19-20.

Further, the ALJ's reliance on Fluker's lack of credibility also does not provide a specific and legitimate reason for rejecting Dr. Boroff's opinions. In essence, the ALJ concluded that Fluker misled Dr. Boroff and therefore, that Dr. Boroff's opinion should be given no weight. The specific reasons the ALJ gave for reaching this conclusion are not sufficient, however. The ALJ

42

offered three reasons for concluding Dr. Boroff had been misled.  First, he opined that "apparently" Fluker told Boroff that he "could not read" and this was "certainly false."  AR 18.  It is not clear, however, that Fluker told Dr. Boroff that he was "illiterate" and "could not read or write"; Dr. Boroff's report contains other statements suggesting that this is not what Fluker told him.  AR at 442 ("the patient does acknowledge *significant difficulties* in reading and understanding things that are said to him"; "he reported being in special education and stated he graduated [from high school] without merit") (emphasis added).  Indeed, the ALJ implicitly recognizes that the record is unclear as to what Fluker told Dr. Boroff when he uses the word "apparently."  Moreover, to the extent the ALJ relied on the evaluation of Dr. Taylor, who found some reading ability on the WRAT-3, *see* AR at 541-542, Dr. Taylor explained that "the fact that Mr. Fluker indicated he had significant difficulty reading [is] not in conflict with the scores he received on the WRAT-3" because that test is a measure only of "written decoding" and does "not measure reading comprehension."  AR at 556.

Second, the ALJ contends "Dr. Boroff was led by the claimant to believe that he was regularly tested for substance abuse, when instead he told Dr. Kalich that he had not been requested to do drug testing at all since his release."  *Id.*  Here again, the record is unclear.  Dr. Kalich noted that Fluker had denied being required to test for drugs since his release from jail in 2012 but also wrote that Fluker was, in fact, subject to drug testing.  *AR* at 549.  Dr. Boroff also appears to have believed that Fluker was subject to "regular drug test[ing]" but does not state that Fluker told him as much and the basis for his belief is unclear.

Third, the ALJ states that "[i]t appears that the claimant substantially underachieved on testing with Dr. Boroff, based on the other evidence."  *Id.* at 18-19.  This vague statement falls far short of a legitimate reason for rejecting all of Dr. Boroff's opinions and it is not supported by substantial evidence.  While the ALJ did not specifically identify the "other evidence" upon which he relied in reaching this conclusion, the record contained testing results by four doctors, all of which were referenced by the ALJ at one point or another in his decision: (1) a psychological report dated February 2, 2012, by Dr. Puran Khalsa (finding that Fluker's IQ was in the "extremely low range" and scoring his Mini-Mental State Exam at 14/30), AR at 353-359; (2) a

psychological report dated 10/21/20 by Dr. Sherry Lebeck finding his IQ to be 67, AR at 491-498;

(3) a psychological evaluation dated February 26, 2013, by Dr. Lisa Kalich, finding his IQ to be

70, AR at 547-553 and (4) a psychological evaluation dated May 1, 2014, by Dr. Warren Taylor,

(finding that Fluker's IQ was 86), AR 531-545.  The test scores obtained by these doctors

indicates that Dr. Boroff's results were in line with the results of Drs. Khalsa, Kalich and Lebeck

and that it was only Dr. Taylor  who appears to have obtained a noticeably higher IQ score for

Fluker.   The ALJ offers no explanation for concluding that Dr. Boroff's test results were less

reliable than those of all of the other doctors who conducted psychological testing.  Nor does he

address Dr. Taylor's opinions regarding the reasons for variations in test results obtained by

individuals with mental impairments.

     Similarly, the ALJ does not provide specific and legitimate reasons for concluding that Dr.

Boroff must have been misled by Fluker's alleged falsehoods such that all of his opinions were

generally invalidated; nor is there substantial evidence to support that conclusion. Dr. Boroff

himself acknowledged Fluker's "manipulative quality" (which he found to be consistent with

Fluker's "poor cognitive functioning") but found, based on independent observation that Fluker

was not malingering.  AR at 448, 453.  *See Ryan v. Comm'r of Soc. Sec.,* 528 F.3d 1194, 1199 (9th

Cir. 2008) (finding ALJ erred in rejecting opinion of psychiatrist on the basis that she had relied

on the subjective complaints of claimant where the psychiatrist had made his own clinical

observations in support of findings).  Even assuming Fluker misreported or exaggerated his

symptoms in describing his subjective complaints to Dr. Boroff, the record does not support the

ALJ's conclusion that Dr. Boroff, who had an ongoing treatment relationship with Fluker, was not

able to evaluate Fluker's mental impairments objectively based on his own observations.

     Accordingly, the Court finds that the ALJ failed to set forth specific, legitimate reasons

for disregarding Dr. Boroff's opinion and erred in failing to give them controlling weight.

### 3.  The ALJ Erred in Assigning Dr. Taylor's Opinion Little Weight

    a.  Background

    Fluker contends that the ALJ did not give specific and legitimate reasons, supported by

substantial evidence, for giving Dr. Taylor's opinion little weight.  Specifically, Fluker argues that

the ALJ, in finding that Dr. Taylor's opinion was based solely on subjective statements from Fluker, ignored the fact that Dr. Taylor reviewed Fluker's medical records and conducted several objective tests, as well as a Mental Status Examination and a clinical interview. Fluker also argues that the ALJ's reliance on Fluker's lack of credibility as a basis to reject Dr. Taylor's opinion was in error, as was his ability to "speak articulately and with great thoroughness" at the administrative hearing.

### b. Discussion

At no point did the ALJ conclude that Dr. Taylor's opinion was contradicted by another doctor. The ALJ was thus required to provide clear and convincing reasons for rejecting Dr. Taylor's opinion. *See Ryan v. Comm'r of Soc'l Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008). He did not do so.

Even though the ALJ apparently relied on the results of the psychological testing conducted by Dr. Taylor to discredit Dr. Boroff's conclusions (as discussed above), the ALJ gave little weight to Dr. Taylor's opinions about Fluker's mental impairments for largely the same reason he rejected Dr. Boroff's opinions, namely, that Dr. Taylor was misled by various alleged misrepresentations by Fluker. This is not a clear and convincing reason for giving little weight to Dr. Taylor's opinions. Like Dr. Boroff, Dr. Taylor observed Fluker during the examination interview and conducted a series of psychological tests. *See* AR at 531–45. He also reviewed Fluker's past medical history, including his prior psychological evaluations. *Id.* at 531–32. Because Dr. Taylor's opinions were based on his own observations of Fluker, specific test results and review of his medical records, the ALJ's reliance on Fluker's alleged lack of credibility is not a clear and convincing reason for rejecting Dr. Taylor's opinions.

Similarly, the Court rejects the ALJ's reliance on his belief that Fluker "minimized his substance abuse history" during his examination by Dr. Taylor. In particular, the ALJ points to Fluker's statement during Dr. Taylor's examination (quoted in Dr. Taylor's report, AR at 537) that he "never used meth, heroin, needles or any other illegal drugs." Again, regardless of whether or not this statement was accurate, nothing in Dr. Taylor's report suggests that he was misled by this statement and indeed, the record supports the opposite conclusion as Dr. Taylor states that

reviewed the reports of Drs. Khalsa, Lebeck, and Boroff, all of whom provided accounts of Fluker's substance use history, including his use of illegal drugs. *See id.* at 354, 442–43, 493. Moreover, Dr. Taylor's awareness of this history of substance use is reflected in his conclusion that Fluker's substance abuse history "is <u>secondary</u> to all of [Fluker's] other mental health diagnoses" and is "primarily a way for him to self-medicate." *Id.* at 544 (emphasis in original). Therefore, the Court does not find that this is a sufficient reason for rejecting Dr. Taylor's opinion.

The ALJ also noted in connection with his rejection of Dr. Taylor's opinion that Fluker spoke "articulately and with great thoroughness about his history, indicating good cognition and no appreciable interference from his alleged symptoms." *Id.* But this finding is contrary to Dr. Taylor's opinion, in which he found that Fluker's "cognitive test results indicate that he does have significant cognitive impairment." *Id.* at 544. Indeed, every other doctor who treated or examined Fluker found that his cognition was poor. *See* AR at 453 (Dr. Boroff noting Fluker's poor cognition), 552 (Dr. Kalich finding of "borderline intellectual functioning"); 355 (Dr. Khalsa finding likely "cognitive disorder"); 496 (Dr. Lebeck diagnosis of mild mental retardation). While these doctors' test results may have varied somewhat, all of their opinions contradict the ALJ's assessment of Fluker's cognitive impairment based on his observation of Fluker at the hearing. As such, the ALJ's reliance on Fluker's ability to testify at the hearing about his impairment and history is misplaced. His opinion is not substantial evidence; nor is this a specific and legitimate – much less clear and convincing – reason for rejecting Dr. Taylor's opinion. *See Taylor v. Commissioner of Soc. Sec. Admin.*, 659 F.3d 1228, 1235 (9th Cir. 2011) ("[T]he ALJ's personal observations of [the claimant] do not constitute substantial evidence for rejecting any of the opinions of [the claimant's] physicians who have found [the claimant] psychologically impaired." (citation omitted)).

### 4. The ALJ Erred in Failing to Consider the Opinions of Drs. Khalsa and Lebeck

#### a. Background

Fluker contends that the ALJ erred in failing to provide specific and legitimate reasons for not considering the opinions of Drs. Khalsa and Lebeck, on the basis that "Social Security

United States District Court
Northern District of California

1    regulations require the ALJ to consider all relevant medical evidence when determining whether a

2    claimant is disabled."  Plaintiff's Motion at 10 (citing 42 U.S.C. § 404.1527(c)).  Fluker argues

3    that "[w]hile the opinions pre-date the period being adjudicated, both are highly probative,

4    relevant and support the overall conclusion that Mr. Fluker is disabled."  *Id.* at 11.

5          The Commissioner contends that the ALJ was not required to give reasons for rejecting Dr.

6    Lebeck's October 2010 report because the prior ALJ's decision had already addressed it.

7    Defendant's Motion at 13.  The Commissioner concedes that the prior ALJ did not address Dr.

8    Khalsa's February 2012 report or the addendum to Dr. Lebeck's opinion, but states that, because

9    the prior ALJ's decision was entitled to res judicata for the period prior to June 12, 2012, "this

10   does not change the fact that the current ALJ was not required to consider the period prior to June

11   2012."  *Id.* at 13-14.

12         In his reply, Fluker stresses that the opinions of Drs. Khalsa and Lebeck "provide crucial

13   corroborating evidence regarding [Fluker's] symptoms, limitations and diagnosis," pointing to the

14   fact that both doctors' objective testing led to diagnoses of MDD and PTSD "with identical

15   symptoms and limitations as Drs. Boroff, Taylor and Kalich."  Reply at 8 (citing AR at 357, 496).

16   Fluker notes that the previous ALJ did not review Dr. Khalsa's report, "indicating that this report

17   received no objective analysis from an ALJ."  *Id.* at 9 n. 3.

18              b.  Discussion

19         The ALJ does not need to discuss every piece of evidence in the record and may decline to

20   address evidence that is neither significant nor probative.  *Howard v. Barnhart*, 341 F.3d 1006,

21   1012 (9th Cir. 2003).  Conversely, the Secretary may not reject "significant probative evidence"

22   without explanation.  *Flores v. Shalala*, 49 F.3d 562, 570-71 (9th Cir. 1995).  Here, the ALJ relied

23   heavily upon the results of psychological testing – and particularly, what he found to be a

24   significant improvement in performance in the results obtained by Dr. Taylor as compared to test

25   results obtained by both Dr. Khalsa and Dr. Lebeck – to find that Fluker would not be disabled if

26   he stopped substance use.  Thus, the results obtained by Drs. Lebeck and Khalsa were highly

27   relevant to the ALJ's disability inquiry.  Similarly, the question of whether Fluker was intoxicated

28   when he tested with Dr. Lebeck in 2010, which Dr. Lebeck specifically addressed in her

Addendum (which was not addressed by the prior ALJ) was directly relevant to whether it would be reasonable to conclude (as the ALJ apparently did), that Fluker obtained higher test scores with Dr. Taylor because he was not under the influence of alcohol or drugs. Further, both doctors diagnosed Fluker with severe MDD and chronic PTSD, and found Fluker to have far more significant impairments than the ALJ found, corroborating the opinions Drs. Boroff and Taylor. Therefore, these opinions were significantly probative and the ALJ should have addressed them.

The Court rejects the Commissioner's reliance on the res judicata effect of the prior ALJ's June 12, 2012 decision. As noted above, the ALJ found that the presumption of continuing nondisability under *Chavez* has been rebutted and the parties have not challenged that conclusion. It is true that even when the *Chavez* presumption is rebutted, a prior ALJ's findings made in the sequential evaluation process for determining disability are binding unless there is new and material evidence relating to such a finding. Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3. Here, however, the Commissioner has not pointed to specific findings by the prior ALJ that preclude consideration of the opinions of these doctors. Further, to the extent that Dr. Lebeck submitted an addendum clarifying statements in her October 2010 report, and that Addendum was not addressed by the prior ALJ, the Court concludes that the findings of the prior ALJ as to Dr. Lebeck's initial report are not binding because of this new and material evidence.

### D. Did the ALJ Err in Finding Substance Use Material to Fluker's Impairments

#### 1. Legal Standard for Reviewing Substance Use Materiality

If an ALJ finds that the claimant is disabled and there is medical evidence of drug addiction or alcoholism, the ALJ must determine whether the "drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 416.935(a). The key factor in making this determination is whether the claimant would still be found disabled if he stopped using the drug or alcohol. *Id.* § 416.935(b)(1). The claimant's drug or alcohol addiction is only a material contributing factor to the determination of disability if the remaining limitations would not be disabling. *Id.* § 416.935(b)(3).

A six-step approach to determining whether DAA is material to disability is set forth in SSR 13-2P, which summarizes the inquiry as follows:

48

1. Does the claimant have DAA?

    a. No—No DAA materiality determination necessary.

    b. Yes—Go to step 2.

2. Is the claimant disabled considering all impairments, including DAA?

    a. No—Do not determine DAA materiality. (Denial.)

    b. Yes—Go to step 3.

3. Is DAA the only impairment?

    a. Yes—DAA material. (Denial.)

    b. No—Go to step 4.

4. Is the other impairment(s) disabling by itself while the claimant is dependent upon or abusing drugs or alcohol?

    a. No—DAA material. (Denial.)

    b. Yes—Go to step 5.

5. Does the DAA cause or affect the claimant's medically determinable impairment(s)?

    a. No—DAA not material. (Allowance.)

    b. Yes, but the other impairment(s) is irreversible or could not improve to the point of nondisability—DAA not material. (Allowance.)

    c. Yes, and DAA could be material—Go to step 6.

6. Would the other impairment(s) improve to the point of nondisability in the absence of DAA?

    a. Yes—DAA material. (Denial.)

    b. No—DAA not material (Allowance.)

Soc. Sec. Ruling, SSR13-2p.; Titles II & Xvi: Evaluating Cases Involving Drug Addiction & Alcoholism (DAA), SSR 13-2P (S.S.A. Feb. 20, 2013).

The claimant bears the burden of proving his substance use is not a material contributing factor. *Parra v. Astrue*, 481 F.3d 742, 744-45 (9th Cir. 2007). In *Parra*, the Ninth Circuit found that the plaintiff failed to carry his burden because "[t]he record offered no evidence supporting the notion that the disabling effects of [the plaintiff]'s cirrhosis would have remained had he

49

stopped drinking," and his physician had stated that cirrhosis is generally reversible. *Parra*, 481 F.3d at 748. On the other hand, "there does not have to be evidence from a period of abstinence for the claimant to meet his or her burden of proving disability." SSR 13-2p, 2013 WL 621536, *4 (Feb. 20, 2013).

### 2. The ALJ Erred in Conducting the DAA Materiality Analysis

#### a. Background

Fluker contends that the ALJ's conclusion that in the absence of substance use he would not have an impairment or combination of impairments that meets or equals a listing is not supported by substantial evidence. In particular, he asserts that the ALJ was required to provide specific reasons at each of the six steps of the analysis and that he provided instead only conclusory boilerplate statements. He also contends the conclusion is not supported by substantial evidence as all of the doctors who addressed the issue found that Fluker would remain impaired in the absence of substance use. Fluker also contends the ALJ erred at part six of the DAA materiality analysis in finding that Fluker's impairments would improve to the point of non-disability absent DAA based on his time at Santa Rita jail as the evidence in the record does not support that conclusion.

#### b. Discussion

The Court concludes that the ALJ committed legal error in his DAA analysis. First, his conclusion that Fluker would not meet any of the three Listings (12.04, 12.06 and 12.09) in the absence of substance use is almost entirely boilerplate. Although the ALJ found that Fluker would have "mild limitations in activities of daily living; mild to moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation, each of extended duration," he did not point to any medical opinions or other specific evidence in support of these conclusions, relying only on "an assessment of the longitudinal record." AR at 17. "An ALJ must evaluate the relevant evidence before concluding that a claimant's impairments do not meet or equal a listed impairment. A boilerplate finding is insufficient to support a conclusion that a claimant's impairment does not do so." *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).

Second, the ALJ's conclusion at step six that Fluker's impairments would improve to the

1  point of nondisability in the absence of DAA is not supported by substantial evidence. The ALJ

2  pointed to Fluker's "greatly improved performance on testing with Dr. Taylor and his ability to

3  work nearly full time while incarcerated and presumably not using drugs and alcohol" in support

4  of his conclusion that Fluker's "depressive and other symptoms would improve (and have

5  improved) to the point of nondisability in the absence of DAA." AR at 21. Both reasons fall

6  short.

7       The ALJ's reliance on Dr. Taylor's test results does not support his conclusion because

8  there is no evidence in the record establishing that the improved performance had anything to do

9  with Fluker being more sober when he took these tests than when he took the previous tests.

10  Indeed, the ALJ found that "without drug testing there is no reason to believe [Fluker] has not

11  continued to use other substances" in addition to cannabis. AR at 20. His implicit finding that the

12  test results obtained by Dr. Taylor reflect Fluker's mental impairments during a period of sobriety

13  while the prior tests reflect his abilities and mental limitations while using drugs and/or alcohol

14  simply has no evidentiary basis in the record. Further, as discussed above, the ALJ improperly

15  discounted the test results obtained by Dr. Boroff (who opined that Fluker was "clean" at the time

16  of evaluation) reflecting more severe impairments and the opinions of Dr. Taylor himself, who

17  described severe mental impairments and associated limitations in the same report that included

18  the test results upon which the ALJ relied.

19       In addition, no treating or examining physician expressed the opinion that Fluker's

20  impairments would be diminished in the absence of substance use. To the contrary, Drs. Taylor,

21  Lebeck and Boroff all stated the opposite. *See* AR at 544 (Dr. Taylor), 500 (Dr. Lebeck) and 443

22  (Dr. Boroff). The opinion of Dr. Boroff is particularly significant because he had an ongoing

23  treatment relationship with Fluker and states that his conclusion is based on observing Fluker's

24  symptoms "in the absence of drugs." AR at 443. *See* SSR 13-2P ("Treating sources, especially

25  specialists, may have the best understanding of the specific clinical course of a claimant's DAA

26  and other impairment(s), as well as whether, and the extent to which the other impairment(s)

27  would likely improve absent DAA.").

28       The ALJ's reliance on Fluker's alleged improvement while in Santa Rita Jail also is not

supported by substantial evidence. As discussed above, during his 90 days at Santa Rita Jail, Fluker was treated on six occasions, between September 6, 2012 and November 21, 2012 at the Santa Rita Jail, receiving treatment from Dr. Rosenthal and LMFT Castro. AR at 405–19. Contrary to the ALJ's finding that Fluker experienced no hallucinations while in jail, Fluker reported hearing voices to LMFT Castro. AR at 411. Further, while Dr. Rosenthal reports on November 21, 2012 that Fluker's mood was "fair but subdued" and that Fluker denied any urgent problems that day, this did not cause him to revise Fluker's diagnosis, which he listed in the same report as PTSD and MDD. AR at 412. The fact that Fluker's symptoms on one particular day were not as severe as on other days is not substantial evidence that his substance use was material to his disability. *See* SSR 96-7p, 1996 WL 374186, at *5 (ALJ should consider that "symptoms may vary in their intensity, persistence, and functional effects, or may worsen or improve with time, and this may explain why the individual does not always allege the same intensity, persistence, or functional effects of his or her symptoms.") .

Nor is the fact that Fluker was able to work in the kitchen while he was in jail constitute substantial evidence that substance use was material to his mental impairments. The only evidence about this job is Fluker's own testimony stating that his performance was "poor." There is no evidence in the record showing that this obligatory work while in jail was comparable to an actual work setting; nor is there any evidence as to the demands that were placed on Fluker or whether he was able to perform them adequately. In other words, the ALJ's conclusion that Fluker's ability to work in the kitchen for the short period while he was in jail shows that he had virtually no limitations based on his mental impairments is entirely speculative.

Accordingly, the Court concludes that the ALJ committed legal error and that his conclusion that Fluker's substance use was material to his disability was not supported by substantial evidence.

### E. Did the ALJ Err in His Determination of Fluker's Residual Functional Capacity

#### 1. Legal Standard for Determining Claimant's Residual Functional Capacity

To make a prima facie showing of disability, claimants must establish that they have a severe impairment that prevents them from doing any work they have done in the past. *Tackett v.*

*Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). At this point – Step Five of the five-step analysis – the burden shifts to the Commissioner to show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience. *Id.* (citing 20 CFR § 404.1560(b)(3)). There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can perform: (a) by the testimony of a vocational expert, *or* (b) by reference to the Medical–Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. *Tackett*, 180 F.3d at 1100–01 (9th Cir. 1999) (citing *Desrosiers*, 846 F.2d at 577–78 (Pregerson, J., concurring) (9th Cir. 1988)). Where a claimant suffers only non-exertional limitations, the grids are inappropriate, and the ALJ must rely on other evidence. *Lounsberry v. Barnhart*, 468 F.3d 1111, 1115 (9th Cir. 2006) (citation omitted).

### 2. The ALJ Erred By Failing to Consider All of Fluker's Limitations, Relying On the Grids, and Not Obtaining Vocational Expert Testimony

#### a. Background

According to the ALJ, if Fluker ceased substance abuse he would have no more than a mild restriction in activities of daily living, mild to moderate difficulties in social functioning, and mild to moderate difficulties in concentration, persistence, and pace. AR at 17. He further found that if Fluker ceased substance abuse, he would have the RFC "to perform a full range of work at all exertional levels but with the following non-exertional limitations: he could perform at least simple, routine work." AR at 17. At Step Five, the ALJ found that Fluker had no past relevant work, because he did not earn at the substantial gainful activity level while performing his prior work as a handler, security guard, and grocery bagger. *Id.* at 21. The ALJ then determined that Fluker, being 31 years old, was defined as a younger individual age 18–49 as of the date the application was filed. *Id.* (citing 20 C.F.R. 416.963). The ALJ also found that Fluker has at least a high school education and is able to communicate in English. *Id.* Based on these findings, the ALJ's concluded as follows:

> If [Fluker] ceased substance use, his ability to perform work at all
> exertional levels would be compromised by nonexertional

> limitations. However, these limitations have little or no effect on the occupational base of unskilled work at all exertional levels. A finding of "not disabled" is therefore appropriate under the framework of section 204.00 in the Medical-Vocational Guidelines.

AR at 22. While Vocational Expert Jo Ann Yoshioka was present at Fluker's hearing, *id.* at 30, at no point in the hearing did Ms. Yoshioka provide any testimony, *see id.* at 30–58.

Fluker contends that the ALJ's RFC determination must be set aside because it: (1) is not based on substantial evidence; (2) fails to consider all of Fluker's limitations and restrictions, including limitations the ALJ himself recognized if Fluker stopped using alcohol and/or drugs; (3) relies solely on the Grids; and (4) does not include Vocational Expert testimony. The Commissioner contends that the ALJ's RFC finding that Fluker could perform simple, routine work is supported by substantial evidence.

### b. Discussion

The Court concludes that the ALJ's RFC determination erroneously omits limitations associated with Fluker's mental impairments and that the ALJ erred by relying solely on the Grids to determine that Fluker could perform work that exists in "significant numbers" in the national economy without obtaining testimony of a vocational expert addressing Fluker's non-exertional impairments.

As discussed above, the ALJ erred when he gave no weight to the opinions of Fluker's treating physician, Dr. Boroff. The ALJ's RFC is infected by this legal error because it does not take into account Dr. Boroff's opinions as to the limitations and restrictions imposed on Fluker by his impairments. Dr. Boroff found marked limitations in the following categories: (1) restriction of activities of daily living; (2) difficulties in maintaining social functioning; and (3) deficiencies of concentration, persistence or pace. AR at 447. Similarly, the ALJ improperly discounted the opinions of Dr. Taylor, who also found that Fluker had extreme and marked impairments that were not included in the RFC. Further, as discussed above, both doctors concluded that substance use was not the cause of Fluker's impairments, which would remain even in the absence of substance use; as noted above, Dr. Boroff's opinion on this question is particularly significant because he treated Fluker over the course of a year and observed him during a period of sobriety. Therefore,

to the extent the ALJ's RFC did not include limitations reflecting the opinions of Drs. Boroff and Taylor as to the severity of Fluker's mental health impairments, it is not supported by substantial evidence.

Next, the ALJ erred in relying on the Grids for his functional limitation assessment. "Significant non-exertional impairments may make reliance on the grids inappropriate." *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001) (quoting *Desrosiers v. Sec'y of Health & Hum. Servs.*, 846 F.2d 573, 577 (9th Cir. 1988)). A non-exertional impairment is an impairment that limits a claimant's ability to work without directly affecting his strength. *Desrosiers*, 846 F.2d at 579. A vocational expert is required when there are significant and "sufficiently severe" non-exertional limitations not accounted for in the grid. *Hoopai v. Astrue*, 499 F.3d 1071, 1076 (9th Cir. 2007). In *Hoopai*, cited by the Commissioner here, the Ninth Circuit found that the claimant's depression was not sufficiently severe, where: (1) the two evaluating physicians found the claimant had only moderate depression; (2) one of those physicians found the claimant to be exaggerating his symptoms; (3) one doctor found the claimant's depression did not significantly limit the claimant in 17 of the 20 possible categories of impairment in memory and understanding; and (4) the other doctor found the claimant's depression gave rise to only mild or moderate functional limitations. *Id.* at 1076–77.

The Commissioner's reliance on *Hoopai* in support of the ALJ's use of the Grids here is misplaced because this case involves a very different factual record. Dr. Taylor, in contrast to the physicians in *Hoopai*, diagnosed Fluker with severe MDD. AR at 543. Both Drs. Taylor and Boroff diagnosed Fluker with PTSD and found Fluker to have marked and extreme functional limitations arising from his mental impairments. Further, neither doctor found that Fluker was exaggerating his symptoms. Moreover, the diagnoses of Drs. Taylor and Boroff are consistent with the conclusions of two other doctors who evaluated Fluker – Drs. Khalsa and Lebeck. The factual background of this case is thus distinguishable from *Hoopai*, and Fluker's non-exertional impairments rendered the ALJ's sole reliance on the Grids inappropriate for his RFC determination.

In summary, the ALJ failed to account for the limitations imposed on Fluker by his

55

impairments in his RFC and incorrectly relied on the Grids for his functional limitation assessment.

### F.  Did The ALJ Err In Rejecting Fluker's Testimony as Lacking in Credibility

#### 1.  Legal Standard for Reviewing Claimant Credibility Findings

To assess properly the credibility of a claimant's testimony regarding subjective pain and symptoms, an ALJ must engage in a two-step analysis.  *Garrison*, 759 F.3d at 1014.  First, the ALJ determines whether the claimant presented objective medical evidence of an impairment that could reasonably be expected to produce the alleged pain and symptoms.  *Id.* (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035–36 (2007)).  At this step, the claimant need only show that the impairment could reasonably have caused some of the alleged pain and symptoms.  *Id.* (citing *Smolen*, 80 F.3d at 1282).  If the first step is met and there is no evidence of malingering, the ALJ can reject the claimant's testimony only by providing specific, clear, and convincing reasons. *Id* at 1014–15 (quoting *Smolen*, 80 F.3d at 1281; *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)).  The Ninth Circuit has stated that "[t]he clear and convincing standard is the most demanding required in Social Security cases."  *Id.* at 1015 (quoting *Moore v. Comm'r of Soc. Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)).  In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct, his daily activities, his work record, and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), *as amended on reh'g* (Sept. 17, 1997).

#### 2.  The ALJ Failed to Provide Clear and Convincing Reasons For Rejecting Fluker's Testimony

##### a.  Background

Fluker contends that the ALJ failed to make specific findings stating clear and convincing reasons for finding that his testimony was not credible because the "record when viewed as a whole, indicates that the kinds of symptom variance is a direct result of his impairments." Plaintiff's Motion at 19-20.  Fluker also argues that the ALJ was required to consider that

symptoms may vary over time, and that even occasional symptom-free periods are not inconsistent with disability. *Id.* at 20. The Commissioner counters that the ALJ's finding was reasonable because Fluker "was not entirely forthright in his representations to the psychologists who treated or examined him." Defendant's Motion at 20. The Commissioner points to the ALJ's finding that: (1) Fluker falsely claimed to Dr. Boroff that he could not read, which did not comport with Dr. Taylor's findings on the WRAT-3 test; (2) Fluker misrepresented the full extent of his drug testing and substance use history with Dr. Boroff; and (3) Fluker likely exaggerated his symptoms, as shown by his improved test scores with Dr. Taylor. *Id.* at 20-21.

Fluker replies that the record is devoid of any affirmative evidence of malingering and therefore the ALJ was required to provide clear and convincing reasons for finding Fluker's statements were not credible. Reply at 14. Fluker also argues that the examples the Commissioner cites as support for finding Fluker was not credible as to his symptoms and limitations are "inconsequential examples which do not reflect but in fact support the greater picture of [Fluker's] limitations." *Id.* at 15.

        b.  Discussion

At the first step of the credibility analysis, the ALJ found that, if Fluker ceased substance abuse, "the medically determinable impairments reasonably could be expected to produce the symptoms alleged to some degree . . . ." AR at 18. The Commissioner does not dispute this conclusion, which the Court finds is correct. Turning to the second step of the credibility analysis, The ALJ found as follows:

> [Fluker's] "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.
>
> The claimant was found not disabled in June 2012; he filed a new application on August 6, 2012; He was incarcerated apparently from August 28, 2012, through (about) November 24, 2012. While in jail, he was provided with medications for depressive symptoms; he apparently spent his time sleeping and reading; he reported no hallucinations (Exhibit B-7F). Once released, he sought mental health services and medication from Trust Clinic (Exhibit B-9F and B-11F) for about six or seven months, through June 2012 (Exhibits B-9F and B-11F). There is no evidence of treatment of any since then – over 16 months. He was evaluated for the purposes of applying for Social Security benefits in February 2013 and again in

June 2014.

> In assessing the credibility of [Fluker's] allegations about the severity of his symptoms, I note that he apparently told Dr. Boroff at Trust Clinic that he could not read (Exhibit B-9F). This was certainly false, based on the report from jail and the evaluations by Drs. Kalich and Taylor (Exhibits B-20F and B-21F). In addition, Dr. Boroff was led by [Fluker] to believe that he was regularly tested for substance abuse, when instead he told Dr. Kalich that [he] had not been requested to do drug testing at all since his release. It appears that [Fluker] exaggerated his symptoms and substantially underachieved on testing with Dr. Boroff, based on the other evidence. As a result his credibility is significantly undermined . . . .

AR at 19–20.

While the ALJ did not spell out the relevance of Fluker's lack of treatment after his last appointment with Dr. Boroff, he implied that the absence of treatment shows that Fluker exaggerated the severity of his symptoms. This conclusion is not supported by substantial evidence because the ALJ did not address or make any express findings about the reasons for Fluker's failure to obtain treatment. "[I]t is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) (internal quotation marks omitted). Here, Fluker testified at the hearing that he hadn't been able to get to a doctor and that at least one clinic had refused to see him because he had missed so many appointments, in part because of his bad memory. *See* AR 42-43. The ALJ does not point to any other evidence in the record regarding Fluker's reasons for failing to obtain treatment or contradicting Fluker's testimony as to the reasons for his lack of treatment after 2012. Therefore, the ALJ erred in relying on lack of treatment as a basis for finding that Fluker's complaints were not credible.

Next, as discussed above, the conclusion that Fluker lied to his providers about his inability to read and whether he was being tested for drugs after being released from jail is not supported by substantial evidence because the record on both subjects is unclear. Further, the Court finds that the ALJ's conclusion that Fluker intentionally underperformed when tested by Dr. Boroff is not supported by substantial evidence for the reasons discussed above. Therefore, the ALJ's conclusion that Fluker misled his doctors based on these examples is not a clear and convincing reason for finding that Fluker's descriptions of his impairments was not credible.

58

Further, none of the doctors who evaluated or treated Fluker found him to be a malingerer. While Dr. Boroff did note a manipulative quality to Fluker's interactions with him in one session, AR at 453, he opined that this behavior spoke to poor cognitive functioning, *id.*, and on the Mental Impairment Questionnaire Dr. Boroff checked a box indicating that he did not believe Fluker was a malingerer. *Id.*. at 448. Dr. Kalich also noted some issues with Fluker's credibility as a reporter, but again made no affirmative finding that Fluker was a malingerer; indeed, Dr. Kalich commented that, "[d]uring cognitive testing, [Fluker] appeared to put forth his best effort . . . ." *Id.* at 551. As such, the record does not provide affirmative evidence of malingering that would constitute a specific, clear, and convincing reason for rejecting Fluker's testimony. *Gallant v. Heckler*, 753 F.2d 1450, 1455 (9th Cir. 1984) (requiring an ALJ to provide clear and convincing reasons for rejecting a claimant's testimony where "[n]o witness, qualified expert or otherwise, expressed the opinion that claimant was in any way malingering").

Therefore, the Court concludes that the ALJ erred in rejecting Fluker's descriptions of his mental impairments on the basis that he lacked credibility because the ALJ failed to provide clear and convincing reasons for doing so.

### G. Whether the Court Should Remand For an Award of Benefits or For Further Administrative Development

#### 1. Legal Standard for Determining Whether to Remand for Benefits or Further Administrative Proceedings

If an ALJ has improperly failed to credit medical opinion evidence, a district court must credit that testimony as true and remand for an award of benefits provided that three conditions are satisfied:

> (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

*Garrison*, 759 F.3d at 1020. Under such circumstances, a court should not remand for further administrative proceedings to reassess credibility. *See id.* at 1019−21. This "credit-as-true" rule, which is "settled" in the Ninth Circuit, is intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce delay and uncertainty facing claimants, many of

whom "suffer from painful and debilitating conditions, as well as severe economic hardship." *Id.* at 999, 1019 (quoting *Varney v. Sec'y of Health & Human Servs.*, 859 F.2d 1396, 1398−99 (9th Cir. 1988)). A court may remand for further proceedings "when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id.* at 1021.

### 2. Remand for Award of Benefits is Warranted

As discussed above, the ALJ erred in: (1) assigning weight to the opinions of Drs. Boroff and Taylor; (2) not addressing the opinions of Drs. Khalsa and Lebeck; (3) failing to consider the impact of Fluker's impairments in the RFC, and relying solely on the Grids to determine Fluker's functional limitation assessment; (4) finding Fluker's substance abuse to be material to his disability; and (5) failing to provide clear and convincing reasons for rejecting Fluker's testimony. The failure of the ALJ to properly credit the opinions of Drs. Boroff and Taylor – particularly in connection with the DAA inquiry – is of particular significance to the Court's determination of the appropriate remedy. Both of these doctors found that Fluker's impairments were severe and listed significant limitations related to their diagnoses of MDD and PTSD; they also agreed that Fluker's substance use was secondary and that his limitations would remain in the absence of substance use. Dr. Boroff's opinion was based on having observed Fluker during their ongoing treatment relationship when Fluker was not abusing drugs or alcohol. Had the ALJ properly credited these opinions, he would have reached the conclusion that substance use was *not* material to Fluker's disability, therefore ending the inquiry at Step Three based on his finding of disability under the Listings. Therefore, there is no need for further development of the record in this case.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS Fluker's Motion for Summary Judgment, DENIES the Commissioner's Motion for Summary Judgment, and REMANDS this case for award of benefits.

**IT IS SO ORDERED.**

Dated: September 29, 2017

_____
JOSEPH C. SPERO
Chief Magistrate Judge